**STATE of Minnesota, Respondent,**

v.

**Keith W. PLEAS, Appellant.**

**No. CX–81–839.**

Supreme Court of Minnesota.

Jan. 28, 1983.

---

C. Paul Jones, Public Defender, and Elizabeth B. Davies, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief, Appellate Section, Rick Osborne, J. Michael Richardson, Beverly J. Wolfe and Jerry Strauss, Asst. County Attys., Minneapolis, for respondent.

AMDAHL, Chief Justice.

Defendant was charged in district court with aggravated forgery-uttering, Minn. Stat. § 609.625, subd. 1(1), (3) (1982). The omnibus court suppressed a statement defendant made to police at the scene of his arrest on the ground that the statement was obtained in violation of the *Miranda* rule, but the court denied a defense motion to suppress evidence on fourth amendment grounds. Thereafter, defendant waived his right to trial by jury and allowed the trial court to try him on the basis of a stipulation concerning the state's evidence against him.[1] The trial court found defendant guilty as charged. After receiving a presentence investigation report, the trial court sentenced defendant to 1 year and 1 day in prison, with execution stayed for 5 years and probation conditioned on defend-

---

1. In *State v. Lothenbach,* 296 N.W.2d 854 (Minn.1980), we approved the use of the stipulation technique as a means of expediting the determination of guilt without waiving constitutional claims.

ant serving a 1-year term in the workhouse. The trial court stayed the workhouse term pending this appeal.

Around 3 p.m. on October 17, 1980, defendant and Craig Brown, who are black, entered the Q Petroleum Store at 14816 Highway 7 in Minnetonka, which is on the northwest corner of Williston Road and Highway 7 just east of 494. Defendant bought a case of transmission fluid and a carton of cigarettes, paying for the items with a Mastercard issued in the name of Robert Atmore. The total bill was $37.44. Defendant signed the slip with Atmore's name and wrote down an address and telephone number not his own. The card was a card which Mr. Atmore had lost 6 or 7 weeks earlier. Mr. Atmore never authorized defendant to use the card.

Defendant and Brown got in Brown's car, with defendant driving. As they were leaving the lot, Officer Richard Dvorak of the Minnetonka Police Department was driving south on Williston Road coming to the intersection with Highway 7. Looking to his right, he saw the car and noticed that the windshield was cracked and that the car had no front license plate. Dvorak turned right on Highway 7, then turned into the Q lot, and drove up behind the car. As he did this, he noticed that the car's rear license plate was upside down.

Dvorak followed the car east on Highway 7 a short distance, then stopped it. Defendant provided Dvorak with a Minneapolis-issued taxi driver's identification card bearing his name, and Brown showed him a check that had his name on it. After explaining the reason for the stop and asking both to remain in the car, Dvorak returned to his squad car and made a number of calls on his police radio. He had the Department of Public Safety run a check on defendant to see if he had a driver's license and asked the base station to check if there were any outstanding warrants for defendant's arrest. He also ran a registration check on the car. He also described defendant and Brown and asked another patrol officer to go immediately to the Q Store to see what sort of business, if any, defendant and Brown had conducted there.

The information Dvorak requested came back within 5 or 10 minutes. First, he learned that defendant had a valid driver's license but that it had expired. He also learned that the vehicle in question was registered to Brown and that Brown's license had been suspended. Finally, he learned from the officer who went to the Q Store that a man fitting defendant's description (medium height, heavyset, black) had just purchased some items with a charge card issued to Robert Atmore.

Meanwhile, Dvorak's superior, Corporal Terry Belfanz, arrived on the scene at this time and Dvorak briefed him on the facts. They were aware that sometimes people give other people permission to use their credit cards, so they were not sure at this point that defendant had committed a crime. However, they strongly suspected it.

Dvorak then asked defendant to get out and step to the rear of his car, saying that he wanted to talk with defendant. Dvorak asked defendant if he had conducted business at the station, and defendant said yes. He then asked defendant what type of transaction, and defendant said cash. He then asked defendant if he had used a credit card with the name Robert Atmore on it, and defendant said no. He then asked defendant for the sales receipt, and defendant said that he probably had thrown it away.

After Dvorak finished talking with defendant, Belfanz directed the assisting officer, who was still at the Q Store, to bring the person who waited on defendant to the scene. That man, the manager of the store, was on the scene within a very short time and he positively identified defendant as the customer who had used the Atmore credit card.

At this point defendant was told that he was under arrest and he was placed in a squad car. A search of his person before putting him in the car failed to result in the discovery of the card or his copy of the sales slip.

Brown, defendant's companion, was not under arrest at this point and could have

left, although not in his car. There were two reasons that Brown could not have left in his car. First, his license had been suspended. Second, the officers decided to search the car both as an incident of defendant's arrest and because they had probable cause to believe that there was evidence in the car.

The search began in the passenger compartment. The officer did not find the card, the slip, or the items purchased but did find amphetamines in the glove compartment. Brown was then placed under arrest for possession of the drugs and was searched incident to his arrest. Neither the card nor the slip was found in that search either.

After placing Brown under arrest, Dvorak and Belfanz decided to halt the search of the car briefly and tow the car to the police garage, where they could continue the search. They based this decision on the fact that the rush hour traffic was beginning and there had already been instances of gawking motorists almost having accidents.

Once at the police garage, they opened the trunk with a key given them by Brown and they found the items purchased at the store. They also found an illegal shotgun and license plates not belonging to the vehicle. They never found the credit card or the buyer's copy of the sales slip.

Defendant was subsequently charged with the offense of aggravated forgery-uttering. Defendant raised a number of fourth amendment issues at the omnibus hearing. On appeal, however, he raises only three issues.

First, he contends that the stop was illegal because the real reason that the officer made the stop was that defendant is black. Second, he argues that even if the stop was legal, the scope of the police inquiry and the length of the detention were not reasonable in view of the grounds given for the stop. Finally, he argues that the identification of defendant, the case of transmission fluid, and the carton of cigarettes were all the suppressible fruit of any police illegality.

We conclude that the police did not violate defendant's fourth amendment rights.

Under the "objective theory" of probable cause which the United States Supreme Court has adopted, a search must be upheld, at least as a matter of federal constitutional law, if there was a valid ground for the search, even if the officers conducting the search based the search on the wrong ground or had an improper motive. See *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), discussed in 1 W. LaFave, *Search and Seizure,* § 1.2(g) (Supp.1982), and relied upon by this court in a number of cases, including *State v. Ludtke,* 306 N.W.2d 111 (Minn.1981), and *State v. Veigel,* 304 N.W.2d 900 (Minn. 1981). The same rule applies to police investigatory practices short of arrest or search. Underlying the rule is the motion that "sending state and federal courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources." *Massachusetts v. Painten,* 389 U.S. 560, 565, 88 S.Ct. 660, 663, 19 L.Ed.2d 770 (1968) (White, J., dissenting), *quoted in* 1 W. LaFave, *Search and Seizure,* § 1.2(g) (Supp.1982).

In *State v. Barber,* 308 Minn. 204, 241 N.W.2d 476 (1976), we upheld a stop of a motor vehicle based on the officer's suspicions about the reason that the license plates were wired on instead of bolted on. In doing so, we quoted from *State v. McKinley,* 305 Minn. 297, 232 N.W.2d 906 (1975), which is the leading Minnesota case on stopping motor vehicles, and then we stated:

Here the plates were affixed to the vehicle in an unusual, although apparently legal, way. Police and patrol officers from their experience learn to be on the lookout for things such as this because the appearance of license plates, e.g., clean plates on a dirty car, often suggests that the plates do not belong to the vehicle. Thus, persons who use automobiles to get away after committing crimes often put plates from other automobiles on their vehicles in order to escape apprehension even if the plates are observed.

By using wire to affix the plates, one might be able to remove them more quickly than he could if they were bolted to an automobile.

We hold the action of the police officer in stopping defendant's vehicle in this case was proper and not based on mere whim, caprice, or idle curiosity. Here, the facts, together with the reasonable inferences an experienced police officer could draw therefrom, justify the minimal intrusion upon defendant's rights. 308 Minn. at 207, 241 N.W.2d at 477.

In this case the car stopped had a broken windshield, no front license plate, and its rear plate was upside down. These facts provided Officer Dvorak with a valid objective basis for the stop.

Our opinions have not addressed the issue of the permissible length of detention of a person following a stop. However, in *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968), the Court specifically stated that the scope of the police investigation during a detention which follows a lawful stop must be " 'strictly tied to and justified by' the circumstances which rendered [the] initiation [of the investigation] permissible." More recently, in *Michigan v. Summers,* 452 U.S. 692, 701, 101 S.Ct. 2587, 2592–93, 69 L.Ed.2d 340 (1981), the Court stated that in determining the reasonableness of a detention courts should examine both the character of the detention and its justification. In a footnote the Court added:

> If the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* and *Adams* [*v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)]. As one commentator observed:
>
> "It is clear that there are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop. The most common is interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained. Sometimes the officer will communicate with others, either police or private citizens, in an effort to verify the explanation tendered or to confirm the identification or determine whether a person of that identity is otherwise wanted. Or, the suspect may be detained while it is determined if in fact an offense has occurred in the area, a process which might involve checking certain premises, locating and examining objects abandoned by the suspect, or talking with other people. If it is known that an offense has occurred in the area, the suspect may be viewed by witnesses to the crime. There is no reason to conclude that any investigative methods of the type just listed are inherently objectionable; they might cast doubt upon the reasonableness of the detention, however, if their use makes the period of detention unduly long or involves moving the suspect to another locale." 3 W. LaFave, *Search and Seizure* § 9.2, pp. 36–37 (1978).

452 U.S. at 700–01, n. 12, 101 S.Ct. at 2593, n. 12.

An easy case is where an officer stops a driver solely for a traffic infraction and makes a license check which comes back clear. Most courts in other jurisdictions appear to hold that in such a situation the officer must limit himself to a citation for the traffic offense and may not extend the duration of the detention by questioning the driver about things that have nothing to do with the reason for the stop or the detention. *See, e.g., State v. Carter,* 34 Or.App. 21, 578 P.2d 790 (1978). The cases are discussed at 3 W. LaFave, *Search and Seizure,* § 9.2(f) (1978 & Supp.1982).

Our case is a little more complex. As in *Barber,* the case which upheld the stop based on the wired-on license plates, the police in this case were justified in thinking that there might be more to this case than might meet the eyes of people not trained in law enforcement. Not only was the rear plate upside down and difficult to read, but the front plate was missing completely. Officer Dvorak also had reason to

suspect that the occupants of the car had just been in the Q Store, which had been the victim of petty thievery many times. Even if the officer had stopped the defendant for a different kind of traffic offense, he would have been justified in running the standard license check, vehicle registration check, and possibly even warrant check (although the cases are in disagreement on that). But this was the kind of stop that was based on the same basic factors that justified the stop in *Barber.* Under the circumstances, we conclude that the officers were justified in detaining defendant the few extra minutes that were needed before they received the response from the assisting officer that indicated that, according to the store manager, defendant had bought items using a charge card issued in the name of a different person. Using the analysis of *Michigan v. Summers, supra,* the length of the detention was only slightly increased as a result of waiting for this response and there was a reasonable basis for it. That is, that additional intrusion was minimal and it was justified.

 We do not need to address the issue of the propriety of the omnibus court's ruling suppressing defendant's statements in response to the on-the-scene police investigation of him before he was formally placed under arrest.[2] Even without defendant's answers, the police had probable cause to arrest defendant when they did because they knew at the time they arrested him that he had used a card not issued in his own name to purchase items at the store. Probable cause, not certainty, is the test and we believe that even without his answers the police had probable cause to believe that he had illegally used a credit card belonging to another person.

In summary, we reject defendant's contention that the stop was made because the defendant was black and therefore illegal, and his argument that the scope of the police inquiry and the length of the detention were not reasonable in view of the grounds given for the stop.[3]

Affirmed.

**2.** One case dealing with this issue is *In re M.A.,* 310 N.W.2d 699, 700 (Minn.1981).

**3.** Given the clearly valid, objective basis for the stop and subsequent investigation, we do not believe it is necessary to address the general issue of when race is a proper factor in a police officer's decision to investigate, approach, stop, detain, arrest, or search a person. An example of a case in which we upheld use of race as a consideration in a decision to stop is *State v. Walker,* 304 Minn. 590, 232 N.W.2d 212 (1975).