**STATE of Minnesota, Respondent,**

v.

**Thomas Otto GEORGE, Petitioner, Appellant.**

**No. CX–94–2638.**

Supreme Court of Minnesota.

Jan. 16, 1997.

John M. Stuart, Minnesota State Public Defender by Scott G. Swanson, Assistant State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Minnesota Attorney General, Catherine M. Keane, Assistant Attorney General, St. Paul, Kenneth Kohler, Nobles County Attorney, Worthington, for respondent.

## OPINION

GARDEBRING, Justice.

This criminal case raises several issues under the Fourth Amendment to the U.S. Constitution and the comparable provision in the Minnesota Constitution. We are asked to determine whether there was an objective legal basis for the initial traffic stop and whether, assuming the stop was valid, there was consent for the ensuing search. Because we conclude that there was no objective legal basis for the stop and no consent to the search, we reverse the court of appeals and vacate the conviction.

Appellant Thomas Otto George pleaded guilty to illegal possession of a handgun, Minn.Stat. § 624.714 (1994), preserving omnibus issues pursuant to *State v. Lothenbach*, 296 N.W.2d 854 (Minn.1980). He was fined and placed on two years of unsupervised probation. On appeal, he asserted that evidence seized when he was stopped by a Minnesota state trooper should have been suppressed as the product of an unconsented search during a traffic stop that was itself unconstitutional. The court of appeals ruled that there was a "particularized and objective basis" for making the stop and that the search of George's motorcycle was made with consent.

The facts are these: Minnesota State Trooper Eric Vaselaar was on routine patrol on Interstate 90 in Nobles County when he noticed George and a passenger riding a motorcycle westbound on the freeway. At the time, there was significant motorcycle traffic on the highway due to the then-upcoming motorcycle rally in Sturgis, South Dakota. According to Trooper Vaselaar's testimony at the omnibus hearing, he decided to stop George because the motorcycle appeared to have three headlights, a lighting configuration Vaselaar believed to be in violation of Minnesota law.

After stopping the motorcycle, Vaselaar approached George, advised him that he had been pulled over because of the motorcycle's lighting configuration, requested George's driver's license and asked George to sit in

the patrol car. Noticing that George had a folding knife attached to his belt, Vaselaar requested him to remove the knife and his jacket and to leave them on the motorcycle. George complied. In the patrol car, Vaselaar asked if George's license address was current. George informed Vaselaar that he had recently moved and supplied the correct address. Vaselaar issued George a warning card for not having the correct address on his license and for the motorcycle's lighting configuration.

After completing the warning cards, Vaselaar asked George if he was carrying any weapons, open containers of alcohol, or controlled substances. George replied that he was not. After explaining the warnings, Vaselaar asked George if he "had any objections if [the trooper] wanted to take a couple of moments and take a look through the bike looking for the things [they'd] talked about." Vaselaar testified at the omnibus hearing that George told him he had "no objections." George testified that he responded "yes," observing that the search would be "a waste of time" but that Vaselaar stated it was his time and he was "gonna search it anyway." George testified that Vaselaar did not explain that George had a right not to permit the search. George also said that he did not feel he had consented to Vaselaar's search of the vehicle.

Trooper Vaselaar asked George to unlock the motorcycle's saddlebags. George did so and resumed his seat in the car. With the assistance of another trooper, Vaselaar searched George's jacket. He found a plastic bag containing a box of .22 magnum ammunition. Vaselaar asked where the gun to which the ammunition belonged was located;

George responded that he had forgotten about the gun and that it was in his jacket. The troopers recovered a .22 magnum, a Derringer-type revolver, and Vaselaar asked George if he had a permit for the weapon. Upon learning that he did not, Vaselaar arrested George. Searching George incident to the arrest, Vaselaar discovered a flat cigarette case in George's vest pocket containing three homemade cigarettes, which smelled strongly of marijuana. Vaselaar again asked him if any weapons or controlled substances were on or in the bike. This time George responded that a nine millimeter handgun, ammunition, a pipe, and a film canister containing marijuana were in the bike's travel pack. Vaselaar retrieved these items. Vaselaar testified that George made no comments or statements regarding the search.

At the omnibus hearing, during which both George and Vaselaar testified, George contested both the stop and the search as unconstitutional and moved to suppress the items seized. George claimed that there was simply no probable cause for the traffic stop because Vaselaar knew the headlight configuration was not illegal and also that Vaselaar's asserted "objective legal basis" for the stop (suspicion of illegal headlight configuration) was only a pretext for his real intention of obtaining consent to search for evidence of other illegal activity.[1] The trial court denied George's motion. Noting that it was aware that the state patrol had initiated a program targeting motorcycle riders on their way to or from the Sturgis Rally, the trial court said that the stop was "no doubt * * * a pretext stop in that the officer's intention was to seek a consensual search of [George's] motorcycle and belongings." Nevertheless, relying on

---

1. Although George also argues before this court that the stop was illegal because of its "pretextual" nature, our holdings as to the lack of a reasonable basis for the stop and the lack of consent for the search obviate the need for a determination on this issue. Nevertheless, we note that the United States Supreme Court has recently considered this issue. *Whren v. United States*, —— U.S. ——, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). *Whren* involved a stop by plainclothes police officers of a vehicle that, having waited at a stop sign for an extended period of time, turned suddenly without signalling and sped away at an unreasonable speed. The occupants were ultimately arrested for and convicted

of another, more serious crime, and at a pre-trial suppression hearing argued that the traffic stop was a pretext. *Id.* at ——, 116 S.Ct. at 1772. The Court concluded that the constitutional reasonableness of a traffic stop does not turn on the actual motivations of the officer involved. *Id.* at ——, 116 S.Ct. at 1774. "[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." *Id.* at ——, 116 S.Ct. at 1775. We believe that under a *Whren* analysis, any subjective desire by Trooper Vaselaar to seek evidence of other illegal activity would not have invalidated the stop, had it been otherwise valid.

*State v. Everett,* 472 N.W.2d 864, 867 (Minn. 1991), the trial court concluded that, based upon Vaselaar's belief that the headlight configuration on George's motorcycle violated Minn.Stat. § 169.49 (1994), "the stop was valid." The court also rejected George's claim that the ensuing search was not consensual.

On appeal, the court of appeals relied upon *Berge v. Commissioner of Pub. Safety,* 374 N.W.2d 730 (Minn.1985), to conclude that Vaselaar's stop was valid because his "belief (or 'suspicion' or 'assumption') that the violation occurred was reasonably inferable from what he did see." *Id.* at 733. The court also held that "the trial court did not clearly err in accepting the trooper's account of the conversation and concluding that George consented to the search." *State v. George,* No. CX–94–2638, slip op. at 7, 1995 WL 579253 at *3 (Minn.App. Oct. 3, 1995).

▮ In reviewing factual determinations by the trial court bearing on a motion to suppress on Fourth Amendment grounds, we follow the "clearly erroneous" standard. *See e.g., State v. Kvam,* 336 N.W.2d 525, 528–29 (Minn.1983).

▮ We begin with the question of whether the traffic stop was justified by an objective legal basis. When interpreting the Fourth Amendment, which governs the legality of investigatory stops, the U.S. Supreme Court has stated that such a stop "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). This court, in turn, has held that, to make a lawful traffic stop, a law enforcement officer must have a "particularized and objective basis for *suspecting* the particular persons stopped of criminal activity." *Berge,* 374 N.W.2d at 732 (quoting *Cortez,* 449 U.S. at 417–18, 101 S.Ct. at 694–95). Such a suspicion, however, must be something more than a mere hunch; the officer must have objective support for his belief that the person is involved in criminal activity. *State v. Johnson,* 444 N.W.2d 824, 825–26 (Minn.1989) (citing *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)). Our cases, however, do not require much of a showing in order to

justify a traffic stop. Ordinarily, if an officer observes a violation of a traffic law, however insignificant, the officer has an objective basis for stopping the vehicle. *See, e.g., State v. Pleas,* 329 N.W.2d 329 (Minn.1983) (upholding stop based on officer's observation of broken windshield, no front license plate, and rear plate upside down), and *State v. Barber,* 308 Minn. 204, 241 N.W.2d 476 (1976) (upholding stop based on officer's observation that license plate was wired on rather than bolted on).

Vaselaar testified that he stopped George because he believed George's headlight configuration violated Minn.Stat. § 169.49, which states that a motorcycle cannot have more than two headlights. The state argues that the motorcycle ridden by George appeared to Vaselaar to have three headlights and, therefore, that he had an objective legal basis for stopping George. As long as the basis for the stop is reasonable and not the product of whim or caprice or malice, the state contends, the stop is constitutional.

George argues that the headlight configuration on his Harley Davidson was legal, noting that the three lamps identified by Vaselaar as headlights are, in fact, one headlight and two auxiliary passing lamps. He points to the rules promulgated by the Department of Public Safety regarding motor vehicle lighting, which define auxiliary passing lamps as lights intended to supplement a standard headlight. *See* Minn.R. 7425.0110, subp. 6, 7, 33 (1995). George also notes that in order to sell its motorcycles in Minnesota, Harley Davidson must certify that its vehicles are in compliance with Minnesota Rules, including those that he cites. Finally, he notes that Minn.Stat. § 169.56, subd. 4 states that "any motor vehicle may be equipped with not to exceed two auxiliary driving lamps mounted on the front" of the vehicle.

On these facts, we hold that Trooper Vaselaar did not have an objective legal basis for suspecting that the George was driving his motorcycle in violation of any motor vehicle law (or that he was violating any other law). The front lights on George's motorcycle were standard equipment installed at the factory: one high/low beam headlamp and

two low beam auxiliary passing lamps that supplement the lower beam of the standard high/low beam headlamp. State law clearly permits a motorcycle to have two standard high/low beam headlamps and two of the auxiliary passing lamps. There was no *objective* basis in the law for the trooper to reasonably suspect that George was operating his motorcycle in violation of this law.

■ Although our conclusion that there was no objective legal basis for the stop would be sufficient to resolve this case, we choose to address the consent to search issue also raised on appeal in order to provide further guidance to the trial courts in considering such matters. A search of a vehicle with the owner's valid consent is a lawful search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). However, to support a claim that consent was given, the state must prove that it was given freely and voluntarily. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968). The voluntariness of consent is not easily defined. *Schneckloth,* 412 U.S. at 224, 93 S.Ct. at 2046. It must be determined after a careful examination of the circumstances surrounding the giving of the consent. *Id.* at 227, 93 S.Ct. at 2047–48; *State v. Howard,* 373 N.W.2d 596, 599 (Minn.1985) (citing *Schneckloth* ).

We have repeatedly noted that the evaluation of the constitutionality of a search is a complex calculation, requiring careful balancing of the competing interests inherent in a police-citizen encounter. In such a situation, the "requirement of voluntariness reflects 'an accommodation of the complex values implicated in police questioning of a suspect.' " *State v. Dezso,* 512 N.W.2d 877, 880 (Minn. 1994) (quoting *Schneckloth,* 412 U.S. at 224– 25, 93 S.Ct. at 2046–47). In *Dezso,* we said:

> The police must be able to seek the cooperation and ask questions of individuals if the safety and security of the community is to be preserved. At the same time, individuals have a liberty interest, constitutionally protected, against unreasonable prying into their personal affairs. So it is that an officer has a right to ask to search and an individual has a right to say no.

> * * * * [I]t is at the point when an encounter becomes coercive, when the right to say no to a search is compromised by a show of official authority, that the Fourth Amendment intervenes. Consent must be received, not extracted.

*Id.*

Here, George argues that failure to object to a search is not indicative of consent. Trooper Vaselaar's question as to whether George had any objections to a search, George asserts, implied that Vaselaar planned to search anyway and was not really seeking consent but merely appraising George of his intention. Vaselaar asked if George objected to the search after first requesting that George remove his knife and jacket—requests George interpreted as commands. This sequence, George contends, indicated that he was not free to prevent Vaselaar's search.

The state insists that the trial court's ruling was proper, that a reasonable person in George's position would have felt free to decline Vaselaar's request. Conceding that traffic stops can be slightly intimidating, the state observes that this one was not out of the ordinary and, further, it should have been less so for George, who testified that he had been arrested previously.

Underlying our consideration of this consent issue are our serious concerns related to the "pretext problem," inasmuch as the Supreme Court has now made clear that the constitutional reasonableness of a traffic stop does not turn on the actual motivations of the officer involved. *Whren v. United States,* —— U.S. ——, ——, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996). We note first that "very few drivers can traverse any appreciable distance without violating some traffic regulation." B. GEORGE, CONSTITUTIONAL LIMITATIONS ON EVIDENCE IN CRIMINAL CASES 65 (1969 ed.) (quoted in 3 WARREN R. LaFAVE, SEARCH AND SEIZURE § 5.2(e), at 86 (3rd ed. 1996)). Second is our concern that police, who have enormous discretion in enforcing traffic laws, may take advantage of their right to stop motorists for routine traffic violations in order to target members of groups "identified by factors that are totally impermissible as a basis for law enforcement

activity." *United States v. Scopo*, 19 F.3d 777, 785–86 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 207, 130 L.Ed.2d 136 (1994) (Newman, J., concurring).

Because of similar concerns, one commentator has suggested that the concept of voluntary consent ought to be deemed meaningless in the context of a so-called consensual encounter between police and a citizen at an airport or in the context of other police-citizen contacts, *e.g.*, when an officer is effecting a routine traffic stop. *See*, Rebecca A. Stack, Note, *Airport Drug Searches: Giving Content to the Concept of Free and Voluntary Consent*, 77 VA.L.REV. 183, 202 (1991). Short of rejecting the concept of consent to search in the context of routine traffic stops, courts can and should demand sufficient proof in an individual case that the consent to search was truly express, clear and voluntary.

Our opinion in *State v. Dezso*, 512 N.W.2d 877 (Minn.1994), illustrates one way of doing just that, by subjecting claims of voluntary consent in this context to careful appellate review. In *Dezso*, a trooper stopped a truck after clocking it at 63 m.p.h. in a 55 m.p.h. zone. The trooper, intending only to warn the driver, took the driver's license from him and asked him to sit in the front seat of the squad car with him. While waiting for a response to a remote check on the driver's license and the vehicle registration, the trooper asked the driver if he had any alcohol, weapons or controlled substances in his pickup. When the driver said no, the trooper asked, "Any objections if I were to take a look?" The driver replied: "Yeah, if you want to." The license check revealed that the driver's license was valid and there were no Minnesota violations. When the trooper returned the license, the driver appeared to tilt the wallet away from the trooper's view. The trooper testified he thought the driver was "trying to hide something" so—despite having no need for additional identification— the trooper asked the driver if he had anything else with his name on it. While the driver was attempting to provide the trooper with additional identification without reveal-

ing the contents of his wallet, the trooper leaned over to look in the wallet and the following conversation took place:[2]

> TROOPER: "Mind if I take a look at your wallet?"
>
> DRIVER: "No, it's just my stuff."
>
> TROOPER: "Can I take a look at the wallet?"
>
> DRIVER: "Yeah, I got, ah [unintelligible] cards."
>
> TROOPER: "What do you got in your hand there?"
>
> DRIVER: "Oh, a piece of paper."
>
> TROOPER: "Mind if I take a look at it?"
>
> DRIVER: "Well, it's mine * * * not doing anything."

The trooper testified that the driver handed him the wallet, whereas the driver testified that the trooper grabbed it. While going through the wallet the trooper discovered blotter acid (LSD). This led to a search of the truck and the discovery of a rifle, a pistol, and a small amount of marijuana.

Reversing the court of appeal's decision affirming the driver's conviction of possession of LSD, we said:

> It would seem there was apparent consent. As we read the trial court's findings, we understand the trial court to have discredited the defendant's testimony that the officer grabbed his wallet and to have found that defendant handed over his wallet to the officer. But the fact that the wallet was handed over without a verbal protest does not, by itself, establish that the delivery was voluntary. Failure to object is not the same as consent. *See State v. Howard*, 373 N.W.2d 596, 599 (Minn.1985) ("Mere acquiescence on a claim of police authority or submission in the face of a show of force is, of course, not enough.") Consequently, the trial court's conclusion that the defendant "voluntarily surrendered" the wallet is not sustainable simply because there was an "absence of any protest."

*Id.* at 880. We then proceeded to examine the totality of the circumstances bearing on

---

**2.** A microphone in a video camera located on the dashboard of the patrol car recorded the conver-

sation between the trooper and the driver while they were in the patrol car.

whether the defendant voluntarily consented, "including the nature of the encounter, the kind of person the defendant [was], and what was said and how it was said." *Id.* In concluding that the state failed to sustain its burden of proving voluntary consent, we said:

> The officer's questions, though couched in nonauthoritative language, were official and persistent, and were accompanied by the officer's body movement in leaning over towards the defendant seated next to him. There is no indication that defendant was aware that he could refuse to let the officer see the wallet. From the nature of the questions asked and the answers given, it is not all that clear that defendant was voluntarily consenting to a search of his wallet. Arguably, defendant's answers seem not so much to indicate willingness to allow the search as an effort, under intimidating circumstances, to fend off a search with equivocal responses.

*Id.* at 881.

Applying the type of careful review that we spelled out in *Dezso*, we hold that under the totality of circumstances in this case, the state failed to meet its burden of proving that the defendant voluntarily consented to the search. As in *Dezso*, George's responses to Trooper Vaselaar appear more in the nature of "an effort * * * to fend off a search with equivocal responses." *See Id.* Like Dezso, George was stopped on an alleged minor traffic violation. Like Dezso, each response by George to the question of the trooper led to additional queries. Like Dezso, George was unaware that he had a right to refuse consent to the search or to leave,[3] and in George's case, he was confronted by not one, but two law enforcement officers. Equivocation as to consent in such intimidating circumstances is not enough to meet the constitutional test of *Schneckloth* and *Bumper*. It is precisely the kind of "mere acquiescence * * * or submission" that we rejected in *State v. Howard*, 373 N.W.2d 596, 599 (Minn.1985).

In summary, we conclude both that the trooper did not have the required objective legal basis for suspecting George was driving his motorcycle in violation of any motor vehicle law and that the ensuing search was invalid under the totality of circumstances because the state failed to meet its burden of proving that the George voluntarily consented to the search of his motorcycle. Accordingly, we vacate George's conviction of possession of a handgun without a permit.

PAGE and BLATZ, JJ., took no part in the consideration or decision of this case.

## SPECIAL CONCURRENCE

TOMLJANOVICH, Justice (concurring).

I concur with the majority and write only to emphasize that there are two aspects to the second issue addressed by the court. The first is whether it is legitimate for a police officer as part of a routine traffic stop, and in the absence of probable cause to search, to ask the stopped driver for consent to search and to search pursuant to that consent. The second aspect of the issue is whether, *if* it is legitimate to ask for consent in this situation, under what circumstances will the driver's response be sufficient to constitute voluntary consent.

Our decisions in this case and in *Dezso* represent what I believe will be an ongoing attempt to come to grips with the increasing use by state troopers and police officers of subtle tactics to get motorists and others to "consent" to searches. It appears state troopers and police officers are receiving training on getting "consent" to search, similar to the training sales people receive in getting people to agree to buy things they do not want. One technique is to ask the defendant a question along the following lines: "You wouldn't mind if I looked in the truck, would you?" If the person says "no," the officer searches. Consumer protection laws provide some protection to consumers who, as a result of sales pitches from sales people,

3. Although the United States Supreme Court has recently held that notification of one's right to leave is not a necessary prerequisite to a determination that a consent to search was voluntary, *Ohio v. Robinette*, —— U.S. ——, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), the absence of knowledge of the right to leave may be considered as part of the totality of the circumstances in evaluating a consent to search.

"consent" to purchase products they do not want. We are not dealing with vacuum cleaners in this case but with the liberty and privacy interests of all the people of the State of Minnesota, and we have an obligation to ourselves and to the Constitution of this State to do what we can, in our limited role as a court of last resort, to provide reasonable protection to those interests. We have done this in related contexts. *See, e.g., Ascher v. Commissioner of Public Safety,* 519 N.W.2d 183, 187 (Minn.1994) (holding that police use of temporary roadblock to stop cars and investigate large number of drivers in the hope of discovering evidence of alcohol-impaired driving by some of them violates Minn. Const. art. I, § 10, which generally requires police to have individualized objective, articulable suspicion of criminal wrongdoing before stopping a motorist), and *Matter of Welfare of E.D.J.,* 502 N.W.2d 779, 783 (Minn.1993) [relying on Minnesota Constitution in adhering to so-called *Mendenhall/Royer* standard [1] in determining when a person is "seized" for Fourth Amendment purposes and in rejecting United States Supreme Court's departure from that standard in *California v. Hodari,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) ].

I am not prepared at this time to specify the form those protections might take. As the majority notes, we could reject the concept of consent to search in the context of routine traffic stops and so-called voluntary street encounters. A more plausible option is to extend our decision in *State v. Scales,* 518 N.W.2d 587 (Minn.1994) (requiring that all custodial interrogation, including the giving and the waiving of rights, must be recorded when questioning occurs in a place of detention and before then unless not feasible) to the interchange in cases like this in which the trooper or police officer seeks consent to search. Another possibility is to require that the trooper or police officer clearly inform the driver that he has a constitutional right to refuse to consent to the requested search.

1. *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

2. The United States Supreme Court in *Ohio v. Robinette,* —— U.S. ——, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) filed Nov. 18, 1996, inter-

*See* Rebecca A. Stack, *Airport Drug Searches: Giving Content to the Concept of Free and Voluntary Consent,* 77 Va.L.REV. 183, 205–08 (1991).[2] At a bare minimum, we must give heightened review of issues of voluntary consent in this context, as we did in *Dezso.*

In summary, I agree with the court that all we need to do in this case is give the issue of voluntary consent the kind of heightened review we gave it in *Dezso.* Doing that, I agree that under the totality of circumstances the state failed to meet its burden of proving that the defendant voluntarily consented to the search.

preting the Fourth Amendment of the United States Constitution, held that there is no *federal* requirement that a lawfully seized defendant be advised he is free to go before his consent to search will be recognized as voluntary.