Travis Scott SCHUSTER, Appellant,

v.

COMMISSIONER OF PUBLIC SAFETY, Respondent.

No. C0–00–1203.

Court of Appeals of Minnesota.

March 13, 2001.

Barry L. Hogen, Golden Valley, MN, for appellant.

Mike Hatch, Attorney General, Joel A. Watne, Michael R. Pahl, Assistant Attor-neys General, St. Paul, MN, for respondent.

Considered and decided by CRIPPEN, Presiding Judge, RANDALL, Judge, and FOLEY, Judge.*

## OPINION

CRIPPEN, Judge.

Questioning the trial court decision to sustain revocation of his drivers' license, appellant Travis Schuster contends that the revocation rests on incriminating evidence obtained as a result of an unlawful stop of his vehicle. Because the circumstances of the case show a lawful police stop, notwithstanding the fact that a criminal offense was not occurring at the time appellant was stopped, we affirm. On the present record, we also affirm the trial court's approval of the use the Intoxilyzer 5000, Series 68, machine.

## FACTS

Late one evening in January 2000, Freeborn County Deputy Sheriff Charles Malepsy responded to a harassment report by Matt Springsteel. Springsteel complained of two separate incidents of harassment by appellant Travis Schuster earlier that evening—that appellant had stopped his vehicle, a yellow Dodge Dakota pickup truck, yelled at Springsteel and his friends to get out of the road, and exchanged obscenities; and that appellant threatened he would physically hurt Springsteel. Deputy Malepsy was informed earlier that there was an ongoing problem between appellant and Springsteel because Springsteel had a habit of playing music too loudly late at night.

After speaking with Springsteel, Malepsy located appellant's vehicle, drove up directly behind the moving vehicle, and activated his red lights. Appellant turned into a gas station and stopped. The deputy testified that his intentions for the stop

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

were to talk to appellant about the harassment and to ask him not to approach Springsteel directly regarding the loud music. Malepsy testified that he never ticketed or arrested appellant for harassment or disorderly behavior and had no intention to do so.

Having discovered indications of appellant's intoxication after approaching him, Malepsy arrested appellant for driving under the influence of alcohol.

## ISSUES

**1.** Did the trial court err in determining that the police officer had a lawful reason to stop appellant's vehicle?

**2.** Did the court err in permitting the test results of the Intoxilyzer 5000, Series 68, machine?

## ANALYSIS

### 1. Stop

When there is no dispute on the facts, the determination of whether a stop is valid is a legal issue for this court. *Berge v. Commissioner of Pub. Safety*, 374 N.W.2d 730, 732 (Minn.1985). In reviewing the legality of a stop, this court must review "the events surrounding the stop and consider the totality of the circumstances" to determine whether the police had a reasonable and objective basis for the stop. *State v. Britton*, 604 N.W.2d 84, 87 (Minn.2000).

Appellant argues that the trial court erred in admitting evidence of his intoxication because it failed to determine whether Malepsy had a reasonable, articulable suspicion that appellant was involved or about to be involved in criminal activity, and that the court improperly created its own standard in determining that the stop was legal. Based upon our review of the record, we conclude that the trial court did not create a separate test but made a proper determination within the Terry standard.

A stop is lawful if police officers can articulate objective and specific facts that led them, during the course of their investigation, to reasonably suspect the particular person stopped was engaging in criminal activity. *Terry v. State of Ohio*, 392 U.S. 1, 21–22, 30, 88 S.Ct. 1868, 1880, 1884, 20 L.Ed.2d 889 (1968). Officers, however, cannot stop a person based on a mere whim or hunch. *State v. George*, 557 N.W.2d 575, 578 (Minn.1997). But they may make inferences based on their training and experience that would otherwise escape an untrained individual. *State v. Cripps*, 533 N.W.2d 388, 391 (Minn.1995).

In this case, where a police officer stopped a moving vehicle driven by an individual suspected of an ongoing activity that the officer is expected to investigate in the course of his duties, we rely on *Terry*. *Terry* raised the issue of the legality of stopping a person based on a police officer's investigatory observations and suspicions that the person was planning to commit a crime. *Terry*, 392 U.S. at 4–5, 88 S.Ct. at 1871. Although most stops involve ongoing criminal activity, nothing in *Terry* suggests that such circumstances must exist for a stop to be valid. In *Terry*, a police officer observed several men acting as if they were performing reconnaissance of a certain store for a burglary. *Id.* at 5–6, 88 S.Ct. at 1871–72. Without any other information as to ongoing criminal activity except for his knowledge and experience of patrolling that particular area, the police officer stopped the men to investigate their purpose for being in the area. *Id.* at 7, 88 S.Ct. at 1872. The stop and subsequent frisk were held to be lawful because the officer had objective and articulable suspicions of potential criminal wrongdoing based on his investigatory observations. *Id.* at 30, 88 S.Ct. at 1884–85.

Likewise, Deputy Malepsy articulated a particular and objective basis for stopping appellant. Appellant was suspected of having engaged in harassing behavior, resulting in a call to police. Ap-

pellant and his vehicle were specifically identified. Malepsy stopped appellant's vehicle in the course of investigating a reported wrongdoing, and he wanted to prevent the occurrence of future misconduct. Malepsy had a particular and objective basis to suspect that appellant had acted wrongfully and that the conduct might be repeated if the officer did not deter a future occurrence. Although it does not specify a particular crime, a harassment complaint does state an activity that could be threatening to the public and that a police officer is and should be expected to investigate. We conclude that the trial court did not create a new standard but made a proper determination within the *Terry* standard.

### 2. Intoxilyzer

 Appellant argues that the commissioner did not properly approve the Intoxilyzer 5000, Series 68, machine because he failed to adopt a formal rule. The Intoxilyzer 5000 machine is an "infrared breath testing instrument" that was originally approved by rule in 1985. Minn. R. 7502.0420, subp. 2 (1985). In 1999, the commissioner issued Order No. 101b clarifying that the rule approving the original machine extended to the Intoxilyzer 5000, Series 68, including software upgrades and changes. Both instruments use the same method of infrared spectrometry, and the record includes no evidence demonstrating significant differences between the instruments.

■ The Minnesota legislature has empowered the commissioner with great flexibility in developing his own rules and programs in order to meet his regulatory objectives. Minn.Stat. § 14.002 (2000). And we defer to an agency's construction of its own regulations. *St. Otto's Home v. Minnesota Dep't of Human Servs.*, 437 N.W.2d 35, 39–40 (Minn.1989). By reason of these matters of law, and in light of the absence of any record to demonstrate the materiality of alterations to the device that have occurred since 1985, we defer to the commissioner's construction of the original rule in the form of his Order 101b, and as a result, to the commissioner's conclusion that the content of the order could be determined without employing the formal rulemaking process.

### DECISION

The trial court did not err in denying appellant's request to rescind the revocation of his driving privileges, and the court properly determined the absence of cause shown to subject the commissioner's Order 101b to the formal rulemaking process.

**Affirmed.**