*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A24-1890**

State of Minnesota,
Respondent,

vs.

Matthew Sam Mitchell,
Appellant.

**Filed October 6, 2025
Affirmed in part, reversed in part, and remanded
Bentley, Judge**

Crow Wing County District Court
File No. 18-CR-23-3674

Keith Ellison, Attorney General, Lydia Villalva Lijó, Assistant Attorney General, St. Paul, Minnesota; and

Donald F. Ryan, Crow Wing County Attorney, Brainerd, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Adam Lozeau, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Larson, Presiding Judge; Wheelock, Judge; and Bentley, Judge.

**NONPRECEDENTIAL OPINION**

**BENTLEY**, Judge

In this direct appeal from a judgment of conviction for two counts of controlled-substance possession, appellant Matthew Sam Mitchell argues that the district court erred when it denied his motion to suppress evidence of the offense that was discovered after the

officer expanded the scope of a traffic stop to investigate other criminal activity. Mitchell contends that the police officer lacked the reasonable, articulable suspicion necessary to expand the scope of the stop and to pat-down search him when he exited the car. Alternatively, Mitchell argues that one of his sentences must be vacated because both offenses were committed as part of the same behavioral incident.

We conclude that the officer had reasonable, articulable suspicion to ask about drug-related activity and to conduct a pat-down search of Mitchell, and we therefore affirm Mitchell's convictions. We reverse and remand for the district court to vacate one of Mitchell's sentences.

## FACTS

The relevant facts were established through the officer's testimony and footage from his body-worn camera and squad car, which were received into evidence at the contested omnibus hearing on Mitchell's motion to suppress.

One evening, at around 11 p.m., a patrol officer noticed a car at a gas station that had been parked at a pump for "about 30 minutes." The officer recognized the car from prior traffic stops, "was very familiar with the registered owner of the vehicle," and had "had several past drug-related contacts with that individual." However, he saw a woman he did not recognize exit the vehicle from the driver's seat and walk into the gas station. After the woman returned, the officer followed the car as it left the gas station. He observed a traffic violation when the car, which was traveling at around 30 miles per hour in a 50-miles-per-hour zone, crossed the double yellow center line of the road before moving into a turn lane. The officer initiated a traffic stop.

2

The car had four occupants. There were two people in front and two others, including Mitchell, in the back. The officer collected identification from each occupant, but the driver was unable to provide a valid driver's license or proof of insurance. The officer testified that he observed "some mannerisms that made [him] question" whether the driver was under the influence but he "couldn't quite tell for certain." With respect to "both of the back seat passengers," the officer noticed "a couple different indications" that made him suspect that they had used drugs. They had "very shiny" skin, even though it was "fairly cold"; they were "[v]ery fidgety"; and they had "sores on their face."

The officer had the driver come back near his squad car so he could ask additional questions while he checked the occupants' identifications. The officer questioned the driver about her driving status and about where the group had been that evening. He then said, "Looking at your backseat passengers . . . they look like they are very high." The driver initially denied that any of them had used any controlled substances but later told the officer that the backseat passenger next to Mitchell had probably been drinking alcohol.

The patrol officer again expressed his "concern . . . that . . . there's some sort of further drug use going on." When asked if the driver knew about Mitchell's substance use, the driver said she was unsure. The officer also questioned the driver about her own substance use and she explained that she had previously used drugs but had been clean for "a couple of months." The officer then asked if there was anything illegal in the car. The driver told the officer that there was a dirty needle in the car under a floor mat. She also consented to a search of her person, which did not yield anything.

The officer obtained consent to search the car from the front-seat passenger, who said he owned it. As the officer opened the door near where Mitchell was sitting, Mitchell pointed to a large, foldable knife on the floor and asked if he could push it under the seat. The officer told Mitchell to leave the knife where it was and saw a second large, foldable knife lying nearby. He directed Mitchell to exit the car and asked if he could search him. Mitchell did not consent. The officer then asked Mitchell if he had any other knives or weapons on him. Mitchell said that he had a knife in his pocket and began to reach for it. The officer instructed him not to reach for it and to put his hands on the car so that the officer could conduct a pat-down search to retrieve the knife and confirm that Mitchell did not have any other weapons.

As the officer patted down one of Mitchell's coat pockets, the officer commented, "Got a lot of stuff in there, man." While the officer looked through Mitchell's pants pocket, where Mitchell had told him the knife was, Mitchell told the officer that the items in his coat pocket were "just a bunch of junk." After the officer retrieved the knife and placed it in the car, he asked Mitchell if he was lying "about having something on [him]." Mitchell admitted that he had a "gram or two" of fentanyl and later disclosed that he also had methamphetamine. Mitchell was arrested, and respondent State of Minnesota charged him with two counts of fifth-degree controlled-substance possession, in violation of Minn. Stat. § 152.025, subd. 2(1) (2022).

Mitchell filed a motion seeking dismissal of both counts and suppression of "all evidence obtained or taken as a result of the stop expansion and/or search and seizure" and "any evidence obtained as a result" of such evidence.

4

Following a contested omnibus hearing, the district court denied Mitchell's motion. The district court concluded that, throughout the traffic stop, the officer "incrementally picked up on additional information that in turn[] justified the incremental expansions of the stop," including when the officer asked for consent to search the car and pat-down searched Mitchell to remove the knife from his pocket.[1]

Mitchell waived his right to a jury trial and agreed to a stipulated evidence trial under Minnesota Rule of Criminal Procedure 26.01, subdivision 4. The parties agreed that the pretrial ruling was dispositive. The district court found Mitchell guilty of both counts of controlled-substance possession and imposed a sentence of 20 months' imprisonment for each count, to be served concurrently.

Mitchell appeals.

**DECISION**

Mitchell asks this court to reverse his convictions, claiming that the district court erred for two reasons when it denied his motion to suppress. First, he argues that the officer impermissibly expanded the scope of the traffic stop when he began questioning the driver about drug use without reasonable suspicion of criminal activity. Second, Mitchell argues

---

[1] In a one-page memorandum explaining its decision to deny Mitchell's motion to suppress, the district court declined "to set forth its detailed reasoning" because "it would be basically a repackaging of what the State noted in its submissions." The district court seemed to incorporate by reference the state's statement of the facts and law wholesale. Although a district court's "verbatim adoption of the state's proposed findings and conclusions, standing alone, does not constitute grounds for reversal," the Minnesota Supreme Court has discouraged district courts from doing so. *Pederson v. State*, 649 N.W.2d 161, 163 (Minn. 2002). To facilitate meaningful appellate review, it is preferable for a district court to "independently develop its own findings" and to provide its own analysis for its decision. *Dukes v. State*, 621 N.W.2d 246, 258 (Minn. 2001) (quotation omitted).

that the officer's pat-down search was unconstitutional because the officer lacked an objectively reasonable belief that Mitchell was engaged in criminal activity and was armed and dangerous. Alternatively, he argues that one of his sentences must be vacated because both offenses were committed as part of the same behavioral incident. We address each of his arguments in turn.

## I

The United States and Minnesota Constitutions prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. Unless an exception applies, "any evidence obtained as a result of an unreasonable search or seizure must be suppressed." *State v. Bradley*, 908 N.W.2d 366, 369 (Minn. App. 2018). When the facts are not in dispute, as here, appellate courts "review a pretrial order on a motion to suppress evidence de novo and 'determine whether the police articulated an adequate basis for the search or seizure at issue.'" *State v. Williams*, 794 N.W.2d 867, 871 (Minn. 2011) (quoting *State v. Flowers*, 734 N.W.2d 239, 248 (Minn. 2007)). With this standard of review in mind, we turn to Mitchell's specific arguments challenging the denial of his motion to suppress.

## A

In arguing that the officer unlawfully expanded the scope of the traffic stop, Mitchell points to the moment the officer "went beyond asking [the driver] about her driving status and began questioning her about controlled substance use—both her own, and the backseat

passengers'."[2] The state does not dispute that the officer expanded the stop at that point, but it maintains that the officer was justified in doing so.

Under the Minnesota Constitution, "any expansion of the scope or duration of a traffic stop must be justified by a reasonable articulable suspicion of other criminal activity." *State v. Fort*, 660 N.W.2d 415, 419 (Minn. 2003).[3] Reasonable suspicion "must be 'particularized' and based on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *State v. Taylor*, 965 N.W.2d 747, 752 (Minn. 2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "Even lawful activity can serve as the basis for reasonable suspicion." *Id.* at 754. An evaluation of reasonableness requires considering "the totality of the circumstances," which means "looking first to each identified fact supporting reasonable suspicion independently and then considering whether those facts, even if independently weak, are sufficient in the aggregate." *State v. Garding*, 12 N.W.3d 697, 702-04 (Minn. 2024). We must also consider that "officers articulating a reasonable suspicion may make inferences and deductions that might well elude an untrained person" because of their specialized experience and training. *Flowers*, 734 N.W.2d 251-52; *see also Taylor*, 965 N.W.2d at 755 (crediting officer

---

[2] There is no dispute that the car's occupants were seized and that the seizure was lawful when the officer initiated the traffic stop based on his observation of a traffic violation. *See State v. George*, 557 N.W.2d 575, 578 (Minn. 1997) ("Ordinarily, if an officer observes a violation of a traffic law, however insignificant, the officer has an objective basis for stopping the vehicle.").

[3] Mitchell references only the Minnesota Constitution with respect to his challenge to the expansion of the stop to ask the driver about drug activity, so we do not consider whether that expansion violated the Fourth Amendment to the United States Constitution.

testimony about inferences and deductions made, "based on [the officer's] training and experience" that gave rise to reasonable suspicion).

At the time the officer expanded the stop to ask about drug use in this case, the officer was aware of specific and articulable facts that, together, support a conclusion that there was reasonable suspicion of criminal activity. To begin, the officer made observations that the driver and passengers, including Mitchell, may have used drugs recently. The driver displayed some mannerisms that made the officer question whether she was sober. And the officer suspected that Mitchell and the other backseat passenger were under the influence of controlled substances because they had "very shiny" skin "despite it being . . . fairly cold," they had "sores on their face," and they exhibited fidgety behavior. *See Garding*, 12 N.W.3d at 703-04 (stating that officer who observed "signs of prolonged drug use" and scab marks that seemed "relatively recent" on a passenger could reasonably infer recent drug use (quotation omitted)).

The supreme court explained in *Garding* that "[w]hether *current possession* of drugs can reasonably be inferred from a person's apparent recent drug use is a . . . question that cannot be answered by looking to evidence of the [person's] appearance alone." *Id.* at 704. But here, as in *Garding*, there were other specific and articulable facts that make the officer's inference of current possession reasonable. It was late in the evening when the officer observed the car parked at a gas pump for about 30 minutes. *See Thomeczek v. Comm'r of Pub. Safety*, 364 N.W.2d 471, 472 (Minn. 1985) (concluding an officer had reasonable suspicion to initiate an investigatory stop of driver "parked near an empty lot late in the evening in an area . . . where a [crime] might occur," which was "unusual").

8

And, as the officer followed the car, he observed it moving well below the speed limit and crossing the double yellow center line of the road before moving into a turn lane. Based on his experience working on "too many [cases] to count" involving individuals believed to be under the influence of a controlled substance, the officer testified that such "moving" traffic violations were "a lot more prevalent . . . in relation to DWI-related incidences."[4]

Independently, the appearances and behaviors of the driver and the passengers, the late hour, the driving misconduct, and the unusually long stop at the gas station may have been weak indications of criminal activity, and each fact on its own likely would not have been enough for an officer reasonably to suspect that drugs were in the car. *Cf. State v. Burbach*, 706 N.W.2d 484, 490-91 (Minn. 2005) (holding that "a [person's] nervous behavior . . . when the [person] does not exhibit other signs of impairment" is insufficient on its own to establish reasonable suspicion). But "considered together," the officer's observations and the circumstances surrounding the traffic stop tend to make the officer's inference of other ongoing criminal activity "a more reasonable one." *Garding*, 12 N.W.3d at 705. On this record, we conclude that the articulated facts are "sufficient in the

---

[4] The state asks that we also consider other facts as part of the reasonable suspicion analysis, including that the license of the driver was revoked, that no one in the car had a valid driver's license, that the passengers were not wearing seatbelts, and that the front-seat passenger said he purchased the car one month earlier but he had not transferred the title or obtained proof of insurance. We decline to include these in our analysis because we conclude that the officer had reasonable suspicion of criminal activity even without these additional facts. And, the state has not explained why these facts are relevant to the question whether the passengers were engaged in drug activity, such that the facts would support an expansion of the stop to inquire about drugs. We also do not consider for purposes of this issue the information that Mitchell and other passengers were on probation for controlled-substance crimes, because it does not appear from the record that the officer learned of that information before he began questioning the driver about her and the passengers' drug use.

aggregate" to support that the officer had reasonable suspicion of other criminal activity that justified an incremental expansion of the traffic stop to ask about drugs. *Id.* at 703.

**B**

Mitchell also argues that the pat-down search that led to the discovery of controlled substances in Mitchell's possession was unlawful. Specifically, he maintains that the officer lacked reasonable suspicion to search him because the officer "never testified to any belief that Mitchell was dangerous and . . . pointed to no facts supporting any such belief." The state argues that the officer's observation of two knives near Mitchell in the car "raised a concern for officer safety and justified a protective pat search."

A warrantless search is "per se unreasonable," unless a "specifically established and well delineated exception[]" to the warrant requirement applies. *Burbach*, 706 N.W.2d at 488 (quotations omitted).[5] It is the state's burden to show that a search or seizure falls within an exception. *State v. Sargent*, 968 N.W.2d 32, 37 (Minn. 2021). One of those exceptions, on which the state relied here, is the *Terry* search exception. *Id.* (citing *Terry*, 392 U.S. 1). Under *Terry*, a police officer may pat-down search a person if "(1) [the officer] ha[s] a reasonable, articulable suspicion that a suspect might be engaged in criminal activity and (2) the officer reasonably believes the suspect might be armed and dangerous." *Id.* at 37-38 (quoting *State v. Dickerson*, 481 N.W.2d 840, 843 (Minn. 1992), *aff'd*, 508 U.S. 366 (1993)). Mitchell focuses his challenge on the dangerousness requirement,

---

[5] With respect to Mitchell's argument that the pat-down search was unconstitutional, Mitchell does not argue that there is a difference between the protections afforded under the United States and Minnesota Constitutions. We therefore consider his arguments with the assumption that the protections are the same under both constitutions.

arguing that there was nothing to support an objectively reasonable belief that Mitchell, despite being armed, was presently dangerous. He also argues that the officer did not testify to anything that would support an "individualized" suspicion that Mitchell was engaged in criminal activity.

The purpose of a pat-down search for weapons is "to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146 (1972). "[T]he issue is whether a [reasonable person] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. In general, "during a routine stop for a minor traffic violation, a pat-down search is improper unless some additional suspicious or threatening circumstances are present." *State v. Varnado*, 582 N.W.2d 886, 890 (Minn. 1998).

Here, such circumstances were present. As the officer initiated the consent search of the car, he observed two large, foldable knives near Mitchell's feet. Moments later, after the officer asked Mitchell to exit the car, Mitchell told the officer that he had another knife in his pocket and began to reach for it. Only then did the officer initiate the pat-down search. Mitchell's possession of three knives, including one on his person, is a "specific and articulable" fact from which the officer could reasonably believe that Mitchell was "armed and dangerous." *Terry*, 392 U.S. at 21.

Mitchell maintains that the officer "never claimed that he believed Mitchell presented a danger to himself or others," and that the officer needed to "point to specific, articulable grounds supporting a belief that Mitchell was presently dangerous." But reasonableness under *Terry* "is an objective standard." *Sargent*, 968 N.W.2d at 38

11

(considering whether the facts available to the officer would cause a person of "reasonable caution" to believe the action was appropriate (quotation omitted)). Even if the officer here did not testify that he personally thought that Mitchell was dangerous, the facts in the record supply a sufficient basis from which a reasonable person could infer that Mitchell was dangerous. Specifically, a reasonable person could infer that someone who was ordered to exit a car so that it could be searched, and who is armed with a knife and reaching for it, might be dangerous. *See Dickerson*, 481 N.W.2d at 846 (holding that police officer was entitled to pat-down search a suspect "based on a reasonable suspicion that [the suspect] might be armed"); *see also Taylor*, 965 N.W.2d at 752 (stating that reasonable suspicion accounts for "rational inferences" taken from the available facts). Moreover, a reasonable person could infer that the knife on Mitchell's person was not simply a tool for everyday use, as Mitchell suggests it might have been. The search was conducted late at night; the driver said they were returning from a shopping trip, not another activity that might have called for use of a knife; and there were two other large, foldable knives visible on the floor of the car. Given these facts and others described above, a reasonable person could conclude that Mitchell was carrying a knife for a purpose other than for typical everyday use. That is so, even taking Mitchell's point that he had been cooperative with the officer up to that point. *Sargent*, 968 N.W.2d at 38 (noting that the inquiry looks at the totality of the circumstances).

Mitchell also argues that the pat-down search was unconstitutional because the officer lacked reasonable, articulable suspicion that Mitchell personally was engaged in ongoing criminal activity. *See Sargent*, 968 N.W.2d at 37 (noting an officer must have "a

reasonable, articulable suspicion that a suspect might be engaged in criminal activity" to conduct a *Terry* pat-down search). But, as we have explained, the officer had reasonable, articulable suspicion to expand the scope of the stop to inquire about drug activity, which led to the consent search of the car. That conclusion was based on facts known to the officer that, in the aggregate, were sufficient to support a reasonable suspicion that the car's occupants, including Mitchell, were engaged in criminal activity. Also, the officer testified that, while he was checking the occupants' identifications in his system before the pat-down search, he learned that Mitchell was "on probation for some variation of a drug charge." That fact, together with his observations of Mitchell's appearance and the other circumstances justifying expansion of the traffic stop, was enough to establish reasonable, articulable suspicion at the time of the pat-down search that Mitchell was engaged in criminal activity.

For these reasons, we conclude that the district court did not err when it denied Mitchell's motion because the officer had reasonable, articulable suspicion to expand the scope of the stop to inquire about drug activity and to conduct a pat-down search of Mitchell after he exited the car. We therefore affirm Mitchell's convictions.

## II

Mitchell alternatively argues that the district court erred when it imposed two sentences for his controlled-substance convictions because they arose from the same behavioral incident. The state agrees, as do we.

A district court may impose multiple convictions for "different incidents (counts) arising out of a single behavioral incident," but it may not impose "multiple sentences for

conduct that is part of a single behavioral incident." *State v. Papadakis*, 643 N.W.2d 349, 357 (Minn. App. 2002) (quotation omitted); *see* Minn. Stat. § 609.035, subd. 1 (2022). "Whether an offense is subject to multiple sentences under Minn. Stat. § 609.035 is a question of law, which [appellate courts] review de novo." *State v. Ferguson*, 808 N.W.2d 586, 590 (Minn. 2012).

"Possession of two controlled substances at the same time and place, for personal use, is a single behavioral incident." *Papadakis*, 643 N.W.2d at 357. Here, Mitchell's convictions stem from his possession of two different substances at the same time and place "with no discernible criminal objective other than personal use." *State v. Reese*, 446 N.W.2d 173, 180 (Minn. App. 1989), *rev. denied* (Minn. Nov. 15, 1989). Accordingly, Mitchell's convictions arose out of a single behavioral incident, and the district court erred by imposing multiple sentences. We therefore reverse and remand to the district court with instructions that the district court vacate one of Mitchell's sentences while leaving the adjudication of guilt on the corresponding count intact.[6]

**Affirmed in part, reversed in part, and remanded.**

---

[6] The sentences for the two counts were identical, and neither party specifies which sentence—the one attached to count one or to count two—should be vacated. We leave that determination for the district court on remand.