**STATE of Minnesota, Respondent,**

v.

**Donald Wayne HOWARD, Appellant.**

**No. C1–84–2252.**

Supreme Court of Minnesota.

Aug. 30, 1985.

Deborah Ellis, Douglas W. Thomson, St. Paul, for appellant.

Julius Gernes, Winona County Atty., Winona, Hubert H. Humphrey, III, Minnesota Atty. Gen., Janet A. Newberg, St. Paul, for respondent.

COYNE, Justice.

The issue on this appeal from the denial of postconviction relief is whether petitioner, who is serving a life term for the 1977 murder of his wife, should receive a new trial on the ground that some of the evidence admitted at his trial was the suppressible fruit of an unlawful warrantless entry of his home by the police to arrest him. We hold that the arrest was legal and affirm.

Early in the evening of August 13, 1977, petitioner's wife, Shirleen Howard, was shot and killed in the basement of the Howard residence in Winona while petitioner and their two daughters were out. Police investigators concluded that the murder weapon was a .45 caliber Llama firearm. Police learned from gun records at petitioner's hardware store that petitioner had transferred five guns, including a .45 caliber Llama, to Bruce Webber. They learned from Charles Murphy, a friend of petitioner, that in 1976 petitioner had offered Murphy $4,000 to kill Shirleen. Police also learned that petitioner later had contacted Raymond Riniker, a former classmate, and tried to hire him to kill her. Acting on the urging of the police, Riniker called petitioner on August 23. Riniker arranged to meet with petitioner at the Howard house later that day. Riniker agreed with the police to wear a concealed transmitting device, and police, who maintained a surveillance of the house, monitored and taped the conversation. During the conversation, petitioner stated:

Listen, let me tell you what happened. This guy—I told you he had backed off. He didn't seem to want to do it. He called me up and said, "Do you still want to do that?" and I said, "Yeah." I said O.K. I come home and that's what I found. He was planning an accident, it was supposed to be an accident. I was so God damn mad—and it was gruesome.

At about 9:45 p.m., after Riniker left, the police arrested petitioner. Questioned at the police station, petitioner denied any complicity in the killing. Questioned again the following day, petitioner confessed, saying that he paid Webber to do it. Webber was arrested on August 26 in Joliet, Illinois, just after he received a package containing money and a ring sent him by petitioner. Police later established that petitioner had had several personal contacts with Webber, including a meeting the day before the murder.

Webber was found guilty of first-degree murder and conspiracy to commit first-degree murder. We affirmed in *State v. Webber*, 292 N.W.2d 5 (Minn.1980).

Petitioner escaped from the Winona County Jail before his trial but was captured in Louisiana with one Nancy Brown a short time later. At his trial he claimed that he sent the money and the ring to Webber because Webber had threatened him and that his confession to police was in jest and was motivated by a desire to get Webber off the street and keep him away from Howard's family. Petitioner, like Webber, was found guilty of first-degree murder and conspiracy to commit first-degree murder.

This is the second appeal by petitioner to this court. Petitioner originally filed a notice of appeal from judgment of conviction. We dismissed that appeal because of the failure of petitioner's counsel to file a timely brief. Petitioner filed his first petition for postconviction relief, and the district court vacated the conspiracy conviction but denied petitioner a new trial. We reinstat-

ed the appeal from judgment and consolidated it with petitioner's appeal from the order of the postconviction court.

One of the claims petitioner made in the district court in the first postconviction proceeding was that his arrest was unlawful pursuant to *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), that his confession and other evidence were the suppressible fruit of the arrest, that he was prejudiced by the admission of the tainted evidence, and that therefore he should be given a new trial. In rejecting this claim, the district court relied on decisions in which we stated our opinion that *Payton* was not to be applied retroactively. *See, e.g., State v. Smith*, 305 N.W.2d 798 (Minn.1981). Petitioner did not challenge the denial of his *Payton* claim in his brief in the first appeal. Accordingly, we did not address the *Payton* issue in our opinion affirming petitioner's conviction of first-degree murder and the postconviction court's denial of a new trial. *State v. Howard*, 324 N.W.2d 216 (Minn.1982), *cert. denied*, 459 U.S. 1172, 103 S.Ct. 818, 74 L.Ed.2d 1016 (1983).

During the pendency of the first appeal, petitioner apparently became aware of the decision of the United States Supreme Court in *United States v. Johnson*, 457 U.S. 537, 562, 102 S.Ct. 2579, 2593, 73 L.Ed.2d 202 (1982), which held that *Payton* applied retroactively "to all cases still pending on direct appeal at the time when *Payton* was decided." *See also State v. Hatcher*, 322 N.W.2d 210 (Minn.1982), in which we overruled our earlier decisions holding that *Payton* was not to be applied retroactively. Petitioner immediately filed the instant petition for postconviction relief, seeking an evidentiary hearing on whether his arrest violated *Payton*. The district court decided that petitioner's arrest did not violate *Payton*. This appeal followed. We agree with the district court that *Payton* was not violated.

■ The holding in *Payton* was that, absent exigent circumstances or consent, police without an arrest warrant may not cross the threshold and enter the suspect's residence to arrest him. As we held in *State v. Patricelli*, 324 N.W.2d 351 (Minn. 1982), however, *Payton* does not prohibit a nonexigent warrantless arrest initiated at the threshold of a suspect's residence if the suspect voluntarily opens the door in response to knocking by the police. Our holding in *Patricelli* was based on *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). In *Santana*, the police, having probable cause to believe that Santana possessed marked money used by an undercover agent to purchase heroin from her, went to her home, where they saw her standing in the open doorway holding a paper bag. When they shouted "police" and displayed their badges, Santana retreated into the vestibule. The police entered the house and caught her and arrested her in the vestibule. Reversing an order suppressing the evidence, the United States Supreme Court, citing *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)—which upheld the nonexigent warrantless arrest of an individual in a public place upon probable cause— concluded that Santana was in a "public" place when she stood in the open doorway:

> While it may be true that under the common law of property the threshold of one's dwelling is "private," as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a "public" place. She was not in an area where she had an expectation of privacy. "What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 [88 S.Ct. 507, 511, 19 L.Ed.2d 576] (1967). She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house. *Hester v. United States*, 265 U.S. 57, 59 [44 S.Ct. 445, 446, 68 L.Ed. 898] (1924). Thus, when the police, who concededly had probable cause to do so, sought to arrest

her, they merely intended to perform a function which we approved in *Watson*. 427 U.S. at 42–43, 96 S.Ct. at 2409–2410. Concluding that Santana was in a "public" place when the officers initiated the arrest and that she could not defeat the arrest by retreating into a private place, the Court reversed.

This case is controlled by *Patricelli* and *Santana*. Riniker left petitioner's house in an emotional state. The police quietly surrounded the house and three or four officers, apparently all wearing plain clothes, went to the door and knocked. Officer Robert Rysavy of the Bureau of Criminal Apprehension and Captain William King of the Winona Police Department stood on the top of the steps outside the door, and Lieutenant Jerrie Seibert, also of the Winona Police Department, stood behind Rysavy and King with a gun drawn but concealed. Petitioner turned on the kitchen lights and then an outside light, then opened the door fully, stepping back as if to make room for the officers to enter. Rysavy and King, with Seibert behind them, stepped just inside the threshold. Each of the three had either met petitioner or talked with him previously in connection with this investigation. Rysavy identified himself, then introduced Seibert and King, then told petitioner that they were there to arrest him for the murder of his wife.

The arrest would have been valid under *Patricelli* and *Santanna* even if petitioner had slammed the door on the offi-

cers.[1] However, as the postconviction court found, petitioner in fact also consented to the limited entry by the officers into his house. The consent necessary in the *Payton* context is consent to enter, not consent to arrest. *United States v. Briley*, 726 F.2d 1301 (8th Cir.1984). Mere acquiescence on a claim of police authority or submission in the face of a show of force is, of course, not enough. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The validity of the consent is for the trial court to determine, based on all the relevant circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In this case, petitioner knew the officers and had cooperated fully with them during their investigation, so fully that on August 13 petitioner gave them a key to the house so that they could gain access to search it if no one was home. Looked at in the light of his prior contacts with the police and his continuing voluntary cooperation with them, petitioner's act of opening the inner door completely and then stepping back as if to make room for the officers to enter can only be interpreted as constituting limited consent to enter. *See State v. Ulm*, 326 N.W.2d 159 (Minn. 1982), and *State v. Graffice*, 294 N.W.2d 324 (Minn.1980), each involving an entry consented to by a suspect's spouse.

Because of our holding, we need not decide whether the police had exigent circumstances,[2] whether the confession was the suppressible fruit of any illegality,[3] or

---

1. The officers initiated the arrest as soon as petitioner opened the door, identifying themselves and stating their purpose either when they crossed the threshold to seize petitioner or seconds later. A decision that an arrest in such a situation is valid only if the magic words informing the defendant that he is under arrest are uttered during the split second that the petitioner is standing in the threshold or hanging onto the doorknob would be ludicrous.

2. Cases bearing on the issue of exigent circumstances in this context include, in addition to the United States Supreme Court's recent decision in *Welsh v. Wisconsin*, —— U.S. ——, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), our decisions in *State v. Lohnes*, 344 N.W.2d 605 (Minn.1984), and *State v. Gant*, 305 N.W.2d 790 (Minn.1981).

3. In *State v. Miller*, 316 N.W.2d 23 (Minn.1982), the defendant contended that his confession was the suppressible fruit of his warrantless arrest at his girl friend's house in violation of *Payton*. We avoided deciding whether the arrest violated *Payton* by remanding for a reopening of the omnibus hearing to determine if the confession was the fruit of a valid search of the defendant's apartment rather than of any violation of *Payton*. We stated:

   Our examination of the record of the omnibus hearing and the transcript of defendant's confession fails to reveal whether the police told defendant that they had searched the apartment before they questioned him. If they did, then it is likely that defendant's knowledge of the results of the lawful search of his apartment and not any illegality in

whether the erroneous admission of the confession was prejudicial.[4]

Affirmed.

KELLEY, J., took no part in the consideration and decision of this case.

---

arresting him without a warrant caused him to confess.
316 N.W.2d at 30–31. In *Miller v. State,* 329 N.W.2d 54 (Minn.1983), we upheld the district court's determination on remand that the defendant's confession was not the fruit of any *Payton* violation.

4. In the earlier appeal in this case, *State v. Howard,* 324 N.W.2d 216, 221–23 (Minn.1982), one of the issues was whether petitioner's confession was obtained in violation of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), which held that once a suspect in-

vokes the right to counsel, the police may not initiate further conversation with the suspect in an attempt to get him to waive that right. We held that the petitioner's request for counsel was not the clear, unequivocal kind of request required by *Edwards* and that, in any event, any error in admitting the confession was harmless error beyond a reasonable doubt. Our holding that any *Edwards* error in admitting the confession was harmless error would seem to apply equally to any claim that petitioner was prejudiced by any other error in admitting the confession.