STATE of Minnesota, Respondent,

v.

Gary Allan DEZSO, Petitioner, Appellant.

No. C0–92–1980.

Supreme Court of Minnesota.

March 11, 1994.

---

John M. Stuart, State Public Defender, Scott G. Swanson, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., William F. Klumpp, Jr., Robert Stanich, Asst. Attys. Gen., St. Paul, and Kenneth Kohler, Nobles County Atty., Worthington, for respondent.

SIMONETT, Justice.

This case raises questions about the validity of the search of a motorist and his vehicle after the motorist has been stopped for speeding.

On the night of January 16, 1992, on Highway 60 in Nobles County, a state trooper stopped an eastbound pickup truck clocked at 63 m.p.h. in a 55 m.p.h. zone. The trooper's

squad car was equipped with a video camera mounted on the dashboard, pointing forward, and included audio equipment to record conversations in the squad car. The officer activated the camera and then walked to the pickup stopped in front of the squad car.

The officer told the driver—defendant Gary Dezso—that he had been stopped for speeding and asked to see his driver's license. Defendant took his license out of his wallet and gave it to the officer. Following his standard procedure, the officer then asked defendant to come back and sit with him in the squad car.

Once in the squad car, the officer used his radio to request a license check. While waiting, defendant explained he was traveling home to Michigan from a construction job in California. When asked if he had any alcohol, weapons, or controlled substances in his pickup, defendant replied he did not. The officer then said, "Any objections if I were to take a look?" Defendant replied, "Yeah, if you want to." The two men, however, continued to talk.

Defendant admitted he had been speeding, and the officer replied he was only going to give defendant a warning ticket. Soon thereafter the dispatcher reported over the radio that defendant had a valid Michigan driver's license and there was no record of any Minnesota violations.

At this point, the officer returned the driver's license to defendant, but as he did so, he noticed that the defendant seemed to tilt his wallet away from the officer's view. Thinking that defendant was "trying to hide something," the officer then asked the defendant if he had anything else with his name on it. As the defendant removed various cards from the wallet to show the officer, the officer testified, "I leaned towards him a little bit looking at his wallet." Again, the defendant evasively tilted the wallet away from the officer's gaze.

The following conversation, as recorded on the audio tape, then occurred:

Officer: Mind if I take a look at your wallet?

Def.: No, it's just my stuff.

Officer: Can I take a look at the wallet?

Def.: Yeah, I got, ah [unintelligible] cards.

Officer: What do you got in your hand there?

Def.: Oh, a piece of paper.

Officer: Mind if I take a look at it?

Def.: Well, it's mine * * * not doing anything.

The officer testified at the omnibus hearing that he did not look at the piece of paper in defendant's hand because he interpreted defendant's response ("Well, it's mine * * * ") as a denial of consent to look at the piece of paper. It was during the above-quoted conversation, according to the officer's testimony, that defendant handed over the wallet; the defendant, on the other hand, testified that the officer grabbed the wallet from him. (Because the dashboard camera points forward and shows only the pickup truck parked ahead, the video is no help in explaining the wallet transfer.)

In going through the contents of the wallet, the officer discovered blotter acid (LSD). The officer then told defendant he believed he had probable cause to search the truck; and although he did not put defendant under arrest at this time, he did give defendant a *Miranda* warning. When asked if he had anything in the truck, defendant told him there was a .22 caliber rifle, a .22 caliber pistol, and some marijuana. And, indeed, this is what the officer found.

Defendant was arrested and subsequently charged with a number of offenses. At the omnibus hearing, defendant's motion to suppress the items seized as a result of the warrantless searches of his wallet and truck was denied. The trial judge concluded "that the Defendant, in the absence of any protest, voluntarily surrendered his wallet to the Trooper." The trial judge further reasoned that because the defendant had initially consented to a search of the pickup, the weapons and marijuana inevitably would have been discovered, and this discovery would, in turn, have provided probable cause for arrest and a search of defendant and his wallet.

Defendant was subsequently tried on stipulated facts on one charge, and the court found him guilty of fifth degree possession of

a controlled substance (LSD). Defendant was sentenced to a stayed prison term, with the stay conditional on his serving 60 days in jail, and fined $1,150. The probationary jail term has been stayed pending appeal. In an unpublished order opinion, the court of appeals affirmed. We granted further review.

The first issue is whether the trooper gained possession of the wallet with the defendant's consent, *i.e.*, with a consent voluntarily given, without coercion or submission to an assertion of authority. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973). Put another way, the issue is "whether a reasonable person would have felt free to decline the officer['s] requests or otherwise terminate the encounter." *Florida v. Bostick,* 501 U.S. 429, ——, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991).

■ This requirement of voluntariness reflects "an accommodation of the complex values implicated in police questioning of a suspect." *Bustamonte,* 412 U.S. at 224–25, 93 S.Ct. at 2046. The police must be able to seek the cooperation and ask questions of individuals if the safety and security of the community is to be preserved. At the same time, individuals have a liberty interest, constitutionally protected, against unreasonable prying into their personal affairs. *Id.* So it is that an officer has a right to ask to search and an individual has a right to say no. Questioning by the police, for the innocent as well as the criminally-implicated, even under benign circumstances, can be an intimidating experience; but reasonable persons understand that this is part of the "accommodation of the complex of values" involved. Consequently, involuntariness of a consent to a police request is not to be inferred simply because the circumstances of the encounter are uncomfortable for the person being questioned. Rather, it is at the point when an encounter becomes coercive, when the right to say no to a search is compromised by a show of official authority, that the Fourth Amendment intervenes. Consent must be received, not extracted.

■ "Voluntariness" is a question of fact and it varies with the facts of each case. The test is the totality of the circumstances.

*Bustamonte,* 412 U.S. at 249, 93 S.Ct. at 2059. Subject to certain exceptions, a warrantless search and seizure without probable cause is a *per se* violation of the Fourth Amendment; thus, in our case here, to come within an exception to the rule, the burden of proof is on the prosecutor to show that the search and seizure was with the individual's voluntary consent.

■ We turn now to the facts of this case. It would seem there was apparent consent. As we read the trial court's findings, we understand the trial court to have discredited the defendant's testimony that the officer grabbed his wallet and to have found that defendant handed over his wallet to the officer. But the fact that the wallet was handed over without a verbal protest does not, by itself, establish that the delivery was voluntary. Failure to object is not the same as consent. *See State v. Howard,* 373 N.W.2d 596, 599 (Minn.1985) ("Mere acquiescence on a claim of police authority or submission in the face of a show of force is, of course, not enough."). Consequently, the trial court's conclusion that the defendant "voluntarily surrendered" the wallet is not sustainable simply because there was an "absence of any protest."

■ We need, therefore, to examine the totality of the circumstances, including the nature of the encounter, the kind of person the defendant is, and what was said and how it was said. The encounter in this case took place at night, on a highway, and in the front seat of a parked squad car. There appears to be nothing unusual about the defendant; he was simply a motorist passing through Minnesota when stopped for speeding. As for the questioning, twice the officer asked if he could "take a look" at the wallet in the defendant's hands. Twice more the officer asked defendant about a paper in his hand which he had removed from the wallet. And at some point while this was occurring, the officer leaned over towards the defendant in an attempt to look into the wallet. The request to search the wallet ("Mind if I take a look?") was couched in terms of whether the defendant had any objection to a search. The audio recording indicates that the offi-

cer's questioning and tone of voice were respectful and matter-of-fact. While the officer did not advise defendant that he had a right to refuse his request, the Fourth Amendment does not require for a voluntary search that the defendant know or be told that he has a right to refuse. *Bustamonte,* 412 U.S. at 227, 93 S.Ct. at 2047 (knowledge of right to refuse only one factor in the totality-of-the-circumstances test).

The officer testified he became curious about the wallet when he noticed the defendant was keeping him from looking at its contents. It does not appear, however, that the officer's curiosity amounted to a reasonable or articulable suspicion of criminal activity, *see Florida v. Rodriguez,* 469 U.S. 1, 5, 105 S.Ct. 308, 310, 83 L.Ed.2d 165 (1984), nor does the State so claim. There might be any number of reasons, noncriminal yet personal, why a reasonable person would object to having someone go through his wallet. And while a reasonable suspicion is not a prerequisite for police questioning, *Bostick,* 501 U.S. at ——, 111 S.Ct. at 2386, it would nevertheless seem to be another circumstance that contributes to the nature of the encounter.

 With all this in mind, we conclude that the State has failed to sustain its burden of proof that voluntary consent was given to seize and search the wallet. The officer's questions, though couched in nonauthoritative language, were official and persistent, and were accompanied by the officer's body movement in leaning over towards the defendant seated next to him. There is no indication that defendant was aware that he could refuse to let the officer see the wallet. From the nature of the questions asked and the answers given, it is not all that clear that defendant was voluntarily consenting to a search of his wallet. Arguably, defendant's answers seem not so much to indicate willingness to allow the search as an effort, under intimidating circumstances, to fend off a search with equivocal responses. *Cf. Bustamonte,* 412 U.S. at 220, 93 S.Ct. at 2044 (when asked for permission to search a car, the driver responded, "Sure, go ahead," and used his keys to open the trunk and glove compartment).

There is considerable ambiguity in this record. We stress that no one factor here is controlling. Under the totality of the unique circumstances of this case, however, we conclude it cannot be said that the State has sustained its burden to show a voluntary consent to seize and search the wallet. Consequently, the contents of the wallet must be suppressed.

 Finally, we do not agree with the trial court that discovery of the LSD in the wallet was inevitable. This was an ordinary traffic stop for speeding. The driver's license and record had checked out satisfactorily and a warning ticket had been issued. If the defendant had refused a search of his wallet, it is just as likely he would have revoked his earlier consent to a search of the pickup.

Conviction reversed.