*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0405**

State of Minnesota,
Respondent,

vs.

Robert Stephen Mendez,
Appellant.

**Filed December 22, 2014
Reversed
Larkin, Judge**

Ramsey County District Court
File No. 62-CR-12-2326

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant County Attorney (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Hudson, Presiding Judge; Peterson, Judge; and Larkin, Judge.

**UNPUBLISHED OPINION**

**LARKIN**, Judge

Appellant challenges his conviction of possession of a firearm by an ineligible person. He argues that the district court erred by not suppressing evidence of a shotgun found during a search of his apartment where the district court did not find that the police reasonably believed that the subject of an arrest warrant was residing there at the time of the search and the state did not prove that appellant voluntarily consented to the search. Because the third-party arrest warrant did not justify the warrantless entry and search of appellant's apartment and because the state did not establish voluntary consent, we reverse.

## FACTS

Respondent State of Minnesota charged appellant Robert Stephen Mendez with possession of a firearm by an ineligible person after the police found a shotgun in his apartment during a search, obtained a DNA sample from him while he was incarcerated after the search, and the Minnesota Bureau of Criminal Apprehension (BCA) determined that the predominant DNA profile obtained from the gun matched Mendez's DNA profile. Mendez moved the district court to suppress the gun and DNA evidence. He argued that the warrantless search of his apartment was unconstitutional. He also argued that he did not voluntarily consent to provide a DNA sample and that the police violated *State v. Scales*, 518 N.W.2d 587 (Minn. 1994), by not recording their request for the sample.

2

The district court held a hearing on the matter and heard testimony from Mendez, his mother M.A., his landlord C.L., and the following individuals from the Ramsey County Sheriff's Department: Sergeant Peter Eastman, Commander Robert Pavlak, and Deputy Aron Smestad. Based on the testimony at the hearing, the district court made the following factual findings.

On March 23, 2011, Deputy Smestad received information from a bonding company's undercover agent that an individual named Richard Hill was in apartment five of a building located at 637 Stryker Avenue in Saint Paul. There was a warrant for Hill's arrest for a felony controlled-substance charge. Hill was known to carry guns and to have said that he was "not going back to jail." Within 20 minutes, Deputy Smestad, six to ten Saint Paul police officers and Ramsey County Sheriff deputies, a K9 officer from the Saint Paul Police Department, and the undercover agent from the bonding company met near the Stryker address. Deputy Smestad showed the undercover agent a picture of Hill, and the agent confirmed that Hill was the person he had seen earlier at the address. Deputy Smestad had previously attempted to apprehend Hill at the 637 Stryker address in January or February, but Hill was not there at those times. However, his name was on the mailbox and his clothes were in the apartment.

Three sheriff deputies approached the front door of apartment five, and the Saint Paul police officers went to the rear door of the apartment. The deputies knocked at the front door, and Mendez answered. The deputies identified themselves, told Mendez that they were looking for Hill, and showed Mendez a picture of Hill. The district court noted conflicting testimony regarding the interaction between Mendez and the deputies at the

3

front door. Sergeant Eastman testified that all three deputies had their guns drawn but that he did not recall anyone pointing a firearm at Mendez. Commander Pavlak testified that he had his handgun unholstered in his right hand behind his right thigh when Mendez answered the door. Both Sergeant Eastman and Commander Pavlak testified that Mendez told them that Hill was not there but that they could come in and look for him. Mendez, on the other hand, testified that the deputies had their guns pointed at him when he opened the door and that he never gave them permission to enter.

In resolving the conflicting testimony, the district court found that "there is no question but that the officers entered [Mendez's] apartment with their guns drawn." The district court "accept[ed] the testimony of [Commander] Pavlak that he had his gun un-holstered in his right hand behind his right thigh and that of [Sergeant] Eastman that three sheriff's deputies approached the door and 'probably had their sidearms out.'" But the district court stated that it "does not believe that any of the officers pointed their weapons at [Mendez] when they asked his consent to search the apartment."

The district court noted that Mendez has a previous conviction for first-degree aggravated robbery and is a high-school graduate. The district court stated that Mendez's prior conviction "suggests that [he] has had previous police contacts and is more likely to be aware of his rights than most citizens." The district court also found, based on testimony from Commander Pavlak, that Mendez's mother M.A. told the deputies that she was a renter and invited them to "come in and look." The district court therefore found that "Mendez and his mother freely and voluntarily consented to the search of their apartment."

4

During the ensuing search, Commander Pavlak found a sawed-off shotgun on a bed in a room that the officers believed to be Mendez's bedroom. After determining that Mendez was a convicted felon, the officers arrested him for ineligible possession of a firearm.

The next day, Sergeant Eastman and Deputy Smestad visited Mendez in the Ramsey County jail to obtain a sample of his DNA. Deputy Smestad testified that Mendez was "calm, cool, and collected." Sergeant Eastman testified that Mendez was calm and cooperative. Mendez agreed to provide a DNA sample. The deputies did not record their request for a DNA sample and did not ask Mendez to sign a consent form. Mendez testified that the deputies told him "we need a DNA sample" and did not tell him why they wanted the sample or that he could refuse to provide it. Mendez testified that he did not know he could refuse to provide the sample. The district court noted that "[t]here was no testimony that either Deputy Smestad or [Sergeant] Eastman employed any aggressive or intimidating methods to extract a consent" and that it did "not believe that [Mendez], who is experienced in the criminal justice system by virtue of his felony conviction, . . . was unaware of his right to refuse this search." The district court therefore found that Mendez "voluntarily consented to give a DNA sample."

After finding that Mendez voluntarily consented to the apartment search and to provide the DNA sample, the district court concluded that "[e]ven if the defendant and his mother had not consented to the entry of their apartment," the search did not violate the Fourth Amendment because the officers had a warrant for Hill's arrest and they "had a reasonable belief that Richard Hill was present at 637 Stryker." The district court also

concluded that "the *Scales* decision does not apply to this situation" because the deputies did not interrogate or question Mendez. The district court denied Mendez's motion to suppress.

The case was tried to a jury, the jury found Mendez guilty, and the district court sentenced Mendez to serve 60 months in prison. This appeal follows.

## D E C I S I O N

The Fourth Amendment to the United States Constitution and Article I of the Minnesota Constitution prohibit the unreasonable search and seizure of "persons, houses, papers, and effects." U.S. Const. amend. IV; Minn. Const. art. I, § 10. "The right to be secure in the place which is one's home, to be protected from warrantless, nonconsensual intrusion into the privacy of one's dwelling, is an important fourth amendment right." *State v. Olson*, 436 N.W.2d 92, 96 (Minn. 1989). "[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585, 100 S. Ct. 1371, 1379 (1980) (quotation omitted). Warrantless searches are per se unreasonable, subject to limited exceptions. *State v. Othoudt*, 482 N.W.2d 218, 221-22 (Minn. 1992). The state bears the burden of establishing the existence of an exception to the warrant requirement. *State v. Ture*, 632 N.W.2d 621, 627 (Minn. 2001).

"When reviewing pretrial orders on motions to suppress evidence, we may independently review the facts and determine, as a matter of law, whether the district court erred in suppressing—or not suppressing—the evidence." *State v. Harris*, 590 N.W.2d 90, 98 (Minn. 1999). We review the district court's findings of fact under a

6

clearly erroneous standard, but legal determinations are reviewed de novo. *State v. Bourke*, 718 N.W.2d 922, 927 (Minn. 2006).

Mendez contends that "the district court committed reversible error by not suppressing the shotgun found during the search of [his] home," arguing that "the court did not find that the police reasonably believed the subject of an arrest warrant was residing there at the time of the search and the state did not prove that [he] voluntarily consented to the search of his home." We address each argument in turn.

*Arrest Warrant for Richard Hill*

Mendez first argues that the arrest warrant for Richard Hill did not justify the entry and search of his apartment. Absent exigent circumstances, an arrest warrant does not justify entry into a third party's home to search for the subject of the arrest warrant. *Steagald v. United States*, 451 U.S. 204, 215-16, 101 S. Ct. 1642, 1649 (1981). But "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton*, 445 U.S. at 603, 100 S. Ct. at 1388. "Under *Payton*, officers executing an arrest warrant must have a *reasonable belief* that the suspect resides at the place to be entered and have reason to believe that the suspect is present at the time the warrant is executed." *United States v. Risse*, 83 F.3d 212, 216 (8th Cir. 1996) (quotation and alterations omitted).

Mendez notes that the district court found only that the police had a reasonable belief that Hill was present at 637 Stryker and "did not find that the officers reasonably believed Hill was on March 23, 2011, residing at 637 Stryker." Mendez argues that the

7

record does not support a finding that the officers reasonably believed Hill resided at 637 Stryker at the time of the search because Mendez's landlord testified that she had informed a member of the sheriff's department that Hill had moved and that new tenants were living in the apartment.

Mendez's argument is persuasive. The district court did not address whether the officers reasonably believed that Hill resided at 637 Stryker when they conducted the search, even though there was testimony regarding this issue. Deputy Smestad testified that between January and February 2011, the sheriff's department had "received multiple calls from [the landlord, C.L.,] saying that she was trying to evict Hill" because he had stolen property in the basement and was dealing drugs out of the apartment. Deputy Smestad further testified that C.L. twice asked the sheriff's department to come to the apartment to apprehend Hill and that on at least one occasion, C.L. allowed officers into the apartment to look for him. However, C.L. testified that "a couple weeks" before the search she told Dickie Turner, a deputy with the Ramsey County Sheriff's Office, that Hill no longer occupied apartment five. The district court did not make a finding regarding this testimony.

The state does not dispute that a member of the sheriff's department had been told that Hill no longer resided at 637 Stryker. Instead, the state argues that "these facts are not dispositive of this issue" because "[t]he officer's belief that the subject of an arrest warrant is residing and present at a certain location may be both reasonable and incorrect at the same time." The state, quoting *Risse*, argues that under the *Payton* standard, "the officers' assessment need not in fact be correct; rather, they need only 'reasonably

8

believe' that the suspect resides at the dwelling to be searched and is currently present at the dwelling." *Id.* at 216. The state asserts that "even though Deputy Smestad and the others executing the warrant may have been incorrect in their belief that appellant still resided at the apartment, the belief was reasonable on the facts found by the district court."

But "[w]hen assessing the reasonableness of a[] . . . search, the officer who conducts the search is imputed with knowledge of all facts known by other officers involved in the investigation, as long as the officers have some degree of communication between them. Actual communication of information to the officer conducting the search is unnecessary." *State v. Lemieux*, 726 N.W.2d 783, 789 (Minn. 2007) (citations omitted).

The record shows that Deputy Turner had "some degree of communication" with the officers who searched Mendez's apartment. Sergeant Eastman testified that Deputy Turner was "an analyst for the apprehension unit" who was "assigned to the apprehension unit" and did "workups for [the unit] on warrants." Sergeant Eastman testified that on this case, "[s]ome of the information that [Deputy Smestad] gave out at the briefing probably came from [Deputy Turner] and was relayed to us from there through [Deputy Smestad]." Because Deputy Turner had some degree of communication with the other members of the apprehension unit on this case, his knowledge regarding Hill's reported move from the apartment is imputed to the other deputies. *See id.* The record therefore would not support a finding that the officers reasonably believed that Hill resided at 637 Stryker at the time of the search. And absent such a belief, the warrant for Hill's arrest

9

did not justify the warrantless entry of Mendez's apartment to search for Hill. *See Payton*, 445 U.S. at 603, 100 S. Ct. at 1388.

*Consent Exception to the Warrant Requirement*

Mendez next argues that the state "did not meet its burden of proving voluntary consent, and the district court's contrary conclusion is clearly erroneous." Consent is an exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44 (1973); *State v. Hanley*, 363 N.W.2d 735, 738 (Minn. 1985). To justify a warrantless search based on consent, the state must prove that the consent was freely and voluntarily given. *State v. George*, 557 N.W.2d 575, 579 (Minn. 1997). "'Voluntariness' is a question of fact and it varies with the facts of each case." *State v. Dezso*, 512 N.W.2d 877, 880 (Minn. 1994). Factual findings are clearly erroneous if "we are left with the definite and firm conviction that a mistake occurred." *State v. Diede*, 795 N.W.2d 836, 846-47 (Minn. 2011). If there is reasonable evidence to support the district court's findings, we will not disturb them. *State v. Rhoads*, 813 N.W.2d 880, 885 (Minn. 2012).

When determining whether consent was voluntary, a court considers the totality of the circumstances, including "the nature of the [police] encounter, the kind of person the defendant is, and what was said and how it was said." *Dezso*, 512 N.W.2d at 880. The issue is "whether a reasonable person would have felt free to decline the officer['s] requests or otherwise terminate the encounter." *Id.* (quotation omitted). The supreme court has noted that "[t]he voluntariness of consent is not easily defined." *George*, 557 N.W.2d at 579. The determination requires "a careful examination of the circumstances

10

surrounding the giving of the consent." *Id.* "Consent must be received, not extracted." *Dezso*, 512 N.W.2d at 880. "Mere acquiescence on a claim of police authority or submission in the face of a show of force is, of course, not enough." *State v. Howard*, 373 N.W.2d 596, 599 (Minn. 1985).

The district court found that three deputies knocked on Mendez's front door, with their guns drawn, identified themselves, showed Mendez a picture of Hill, and asked to search the apartment. The record supports those findings. Sergeant Eastman testified that three Ramsey County deputies knocked loudly at the front door to Mendez's apartment, while the Saint Paul police officers knocked at the back door. Sergeant Eastman testified that the deputies used "loud voices" in a show of authority to announce, "[S]heriff's department, come to the door." Sergeant Eastman also testified that the deputies had their guns drawn and wore bullet-proof vests under "raid jackets . . . which have SHERIFF written on the front and back in large letters." Sergeant Eastman testified that after Mendez answered the door, Commander Pavlak showed Mendez a picture of Hill and said, "This is who we're looking for, is he here? . . . Can we come in and look?"

Previous holdings of the supreme court and this court have found a suspect's consent to be involuntary in far less coercive situations. For example, in *Harris*, the supreme court held that a suspect did not voluntarily consent to the search of his person when an officer had already found plastic bindles in the suspect's bag pursuant to a valid consent search and the officer pointedly told the suspect that he knew what the bindles were used for and that the suspect should give the officer the drugs. 590 N.W.2d at 104.

11

In *George*, the supreme court held that the state failed to meet its burden to prove that a suspect voluntarily consented to a search of his motorcycle when the suspect was stopped for a minor traffic violation, he was confronted by two law enforcement officers, each of his responses to the officer's questions led to additional queries, and the suspect's responses appeared to be an effort to fend off a search with equivocal responses. 557 N.W.2d at 581.

In *Dezso*, the supreme court held that the state did not sustain its burden to show that the suspect's consent was voluntary when the suspect and the officer were seated in the front seat of a parked squad car on a highway at night after the suspect was stopped for speeding; the officer repeatedly requested to examine the suspect's wallet; the officer's requests, "though couched in nonauthoritative language, were official and persistent, and were accompanied by the officer's body movement in leaning over towards the defendant seated next to him"; and the circumstances were "intimidating." 512 N.W.2d at 880-81.

Lastly, in *State v. Bell*, this court held that the state did not carry its burden to show that a suspect's consent to search his car was voluntary—even though the suspect signed a consent warning and waiver card stating that the suspect could refuse to allow the search—where the suspect was stopped for a petty misdemeanor, frisked for weapons, placed in the back of a locked squad car by two armed officers, and asked for his consent to search as the officers handed him a warning ticket. 557 N.W.2d 603, 607-08 (Minn. App. 1996), *review denied* (Minn. Mar. 18, 1997).

The state argues that the facts of this case "compare favorably to other cases where appellate courts have deferred to the district court's determination that consent was voluntary, even where the police have shown substantial authority." The state relies on three cases, but each of the cases is distinguishable from this case. In *State v. Alayon*, the supreme court held that consent to search was voluntary even though officers encountered a suspect at the entry to his home and ordered him to the ground at gun point. 459 N.W.2d 325, 327, 330-31 (Minn. 1990). But in *Alayon*, the officers holstered their guns and allowed the suspect to stand up before requesting permission to search the suspect's home. *Id*. at 330. Unlike *Alayon*, the deputies in this case did not abandon their show of force by holstering their guns before asking Mendez to search his apartment or entering the apartment.

In *United States v. Smith*, the Eighth Circuit held that the district court's finding that the defendant's wife gave voluntary consent for officers to enter an apartment was not clearly erroneous where the officers drew their weapons when she opened the door, but there was no evidence that they immediately demanded entry. 973 F.2d 1374, 1376 (8th Cir. 1992). But part of the Eighth Circuit's reasoning was that "the officers had a brief conversation with [the wife] before requesting entry into the apartment" and "the officers immediately left the apartment when [she] requested that they do so." *Id*. The fact that the wife in *Smith* requested that the officers leave showed that she felt free to terminate the encounter. In contrast, there are no facts in this case that show that Mendez felt free to terminate the search of his apartment.

13

In *State v. Bunce*, this court concluded that the district court did not err in determining that consent to search a home was voluntary even though "the officers were armed and persistent in their efforts to question appellant." 669 N.W.2d 394, 399 (Minn. App. 2003), *review denied* (Minn. Dec. 16, 2003). But part of this court's reasoning was that the police informed the defendant of his right to refuse the search. *Id.* Unlike the circumstances in *Bunce*, the record here does not show that the officers told Mendez he could refuse the search.

In sum, caselaw suggests that Mendez's consent was not voluntary. We are not persuaded by the district court's reasons for finding otherwise. For example, the district court noted that Mendez has a previous conviction for aggravated robbery in the first degree, which "suggests that [he] has had previous police contacts and is more likely to be aware of his rights than most citizens." The district court also noted that Mendez is a high-school graduate. But as Mendez argues, "the state presented no evidence showing that there was something about [his] high school education and past legal experience rendering him less likely than any other 21-year-old to be intimidated by a show of force by police," especially when the show of force included three deputies wearing raid gear and having guns drawn at Mendez's front door.

Moreover, the district court's finding that Mendez's "mother freely and voluntarily consented to the search of their apartment" does not justify the warrantless entry to search for Hill. Although Commander Pavlak testified that M.A. invited the officers in "to look," the record clearly shows that his only conversation with M.A. occurred *after* he was already inside the apartment on his way to "go through and allow

14

the back officers to have an open door in case they're needed." Thus, when M.A. provided her consent, the warrantless entry to search had already occurred. See *Payton*, 445 U.S. at 585, 100 S. Ct. at 1379 ("[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (Quotation omitted.)).

"When the police obtain a person's consent to search after unlawful police conduct has occurred, the state must demonstrate both (1) that the subsequently obtained consent was voluntarily given and (2) that the connection between the unlawful conduct and the evidence is so attenuated as to dissipate . . . the taint of the unlawful conduct." *State v. Barajas*, 817 N.W.2d 204, 217 (Minn. App. 2012) (quotation omitted), *review denied* (Minn. Oct. 16, 2012); *see also Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 417 (1963) (observing that evidence obtained by exploiting previous unlawful conduct is inadmissible).

The state does not address whether M.A.'s consent was voluntary. Instead, the state argues that M.A.'s actions "corroborated the district court's finding that [Mendez] voluntarily consented to the officers' entry." But the district court's finding that "the officers entered [Mendez's] apartment with their guns drawn," suggests that M.A.'s consent was obtained in the same coercive environment as Mendez's. *See Dezso*, 512 N.W.2d at 880 (listing "the nature of the encounter" as a relevant factor when determining whether consent was voluntary). Moreover, there is no evidence or finding regarding the kind of person that M.A. is. *See id.* (listing "the kind of person the defendant is" as another relevant factor).

15

For the reasons set forth above, the district court's finding that Mendez and M.A. "freely and voluntarily consented to the search of their apartment" leaves us with a "definite and firm conviction that a mistake occurred," *Diede*, 795 N.W.2d at 846-47. We therefore hold that under the totality of the circumstances, the state did not meet its burden to prove voluntary consent, and it cannot justify the warrantless search under the consent exception. *See George*, 557 N.W.2d at 579.

*Conclusion*

Because neither the warrant for Hill's arrest nor the consent exception to the warrant requirement justify the warrantless entry and search of Mendez's home, the shotgun evidence should have been suppressed. *State v. Jackson*, 742 N.W.2d 163, 177-78 (Minn. 2007) ("Generally, evidence seized in violation of the constitution must be suppressed."). We therefore reverse Mendez's conviction for possession of the shotgun without addressing his additional assertions of error regarding his DNA sample and the *Scales* recording requirement. *See State v. Theng Yang*, 814 N.W.2d 716, 722 (Minn. App. 2012) (reversing unlawful-firearm-possession conviction without remand "[b]ecause police lacked reasonable suspicion to detain [appellant], and because the unconstitutional detention and search produced the evidence that led to his conviction").

**Reversed.**

16