*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A15-0448

State of Minnesota,
Respondent,

vs.

Ronald Wayne Johnson,
Appellant.

**Filed December 21, 2015**
**Reversed; motion granted**
**Reilly, Judge**

Douglas County District Court
File No. 21-CR-13-51

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Chad Larson, Douglas County Attorney, Timothy S. Hochsprung, Assistant County Attorney, Alexandria, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Rodenberg, Presiding Judge; Reilly, Judge; and Klaphake, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

## UNPUBLISHED OPINION

**REILLY**, Judge

On appeal from his conviction of gross overlimit of wild animals in violation of Minn. Stat. § 97A.338 (2012), appellant argues that the district court erred in concluding that appellant voluntarily consented to the search of his house and in denying his pretrial suppression motion.[1] Because appellant's consent was not voluntary, we reverse.

## FACTS

On December 16, 2012, Department of Natural Resources (DNR) Conservation Officer Shane Osborne approached appellant Ronald Johnson at West Spitzer Lake in Otter Tail County while investigating a complaint that someone was over fishing the lake. That day appellant caught and kept three northern pike, two bass, and one sunfish. Appellant had a valid Minnesota fishing license. After inspecting the catch and determining appellant was within the legal limit of fish, Officer Osborne asked appellant how many fish he had back at his house. Appellant responded he was unsure and asked if Officer Osborne thought he (appellant) had too many fish at home. The officer responded "I won't know that until I counted all the fish you had [sic]." The officer asked if he could follow appellant back to his house to "count the fish" or "check for" fish. At first appellant said it was "a

---

[1] "A person who takes, possesses, or transports [fish] over the legal limit, in closed season, or without a valid license, when the restitution value of the [fish] is over $1,000 is guilty of a gross overlimit violation. A violation under this section is a gross misdemeanor." Minn. Stat. § 97A.338; *see also* Minn. R. 6262.0200 (2011) (providing daily catch and possession limits for Minnesota inland waters).

long way," but, when the officer responded "that's OK," appellant ultimately told the officer he could follow appellant back to the house. During the encounter Officer Osborne was dressed in uniform and wearing a sidearm. On the way to appellant's house, Officer Osborne contacted another DNR Conservation Officer, Mitch Lawler, and asked Officer Lawler to meet him at appellant's house. It took Officer Osborne approximately 50 minutes to drive from the lake to the house.

The extensive search of appellant's house lasted for nearly two hours. First, the officers searched a combination refrigerator-freezer, as well as a small chest freezer in the kitchen. Next, they searched a freezer stored in one of the bathrooms. Then the officers searched the basement and upstairs of the house looking for more freezers. They also searched the exterior of the house, a burn pile, and the surrounding ditches for carcasses of fish previously consumed by appellant.

At one point during the search, appellant felt compelled to ask permission to use the bathroom. Throughout the search, the officers appeared increasingly frustrated with appellant. They persisted in asking appellant where he kept his fish, and expressed their belief that appellant was being deceptive. At one point Officer Osborne stated:

> You know . . . to be honest with you, it looks like you've got a bunch of fish in here, and you know, we're going to look through all this stuff. And I'm pretty sure you know what's in here, can you just tell us where the fish are, instead of digging through it? Because, I mean, and I know that you knew the fish were in here.

Similar comments were made throughout the search when Officer Osborne questioned whether appellant was being honest with him:

3

I'm telling you, like I said, you work with us, we'll work with you. The more open and honest you are with us, the easier it is, you now [sic], it is for us, and that goes a long way for us. Okay? Now, it you're telling us a bunch of other fish that are in there that, well, to be honest with you, I don't think that those fish are in there.

. . . .

Come on, Ronald. You know those fish are back there. Look, I've been pretty respectful of you, pretty nice so far. I told you, the more you work with us, the more we'll work with you. Now I'm getting the kind of runaround here, and I guess I'm, you know, I'm not looking at working with you here. I'm going to be honest with you, it doesn't go a long way with me when you are being deceptive here. Alright?

The search ultimately ended when appellant's girlfriend, who was present throughout the search, became upset by the continued search of their house and told the officers "Do what you have to do, and get out of here."

The officers found 268 sunfish, 19 bass, 12 northern pike, and 18 crappies. Appellant was charged with gross overlimit of wild animals in violation of Minn. Stat. § 97A.338. Appellant filed a motion to suppress the fish seized from his home. The district court denied appellant's motion. A jury convicted appellant of the charged crime. On appeal appellant challenges his conviction, arguing that the evidence was obtained in violation of the Fourth Amendment.

**DECISION**

**I.**

The United States and Minnesota Constitutions prohibit unreasonable searches and seizures, U.S. Const. amend. IV; Minn. Const. art. I, § 10, and any evidence obtained as a result of an unreasonable search or seizure must be suppressed. *Wong Sun v. United States*,

4

371 U.S. 471, 484, 83 S. Ct. 407, 416 (1963); *State v. Askerooth*, 681 N.W.2d 353, 370 (Minn. 2004). "[A]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Payton v. New York*, 445 U.S. 573, 589-90, 100 S. Ct. 1371, 1382 (1980) (quotation omitted). Warrantless searches are per se unreasonable unless an exception applies, such as consent. *State v. Othoudt*, 482 N.W.2d 218, 222 (Minn. 1992). For a search to fall under the consent exception, the state must show by a preponderance of the evidence that the defendant freely and voluntarily consented. *State v. Diede*, 795 N.W.2d 836, 846 (Minn. 2011).

The question of whether a consent search was voluntary and not the product of duress or coercion is a question of fact, which we review under the clearly erroneous standard. *Id.* "[C]ourts can and should demand sufficient proof in an individual case that the consent to search was truly express, clear and voluntary." *State v. George*, 557 N.W.2d 575, 580 (Minn. 1997). Claims of voluntary consent are subject to "careful appellate review." *Id.* The voluntariness "analysis requires that we consider the totality of the circumstances, 'including the nature of the encounter, the kind of person the defendant is, and what was said and how it was said.'" *State v. Brooks*, 838 N.W.2d 563, 569 (Minn. 2013) (quoting *State v. Dezso*, 512 N.W.2d 877, 880 (Minn.1994)).

The encounter between Officer Osborne and appellant was coercive from the beginning because it began with a show of authority when an armed, uniformed officer approached appellant to inspect appellant's catch. Although appellant ultimately allowed the officer to search his house, the "consent" given by appellant must be viewed through

5

the lens of the initial encounter. "An individual does not consent . . . simply by acquiescing to a claim of lawful authority." *Id.* (citing *Bumper v. North Carolina*, 391 U.S. 543, 548-49, 88 S. Ct. 1788, 1792 (1968)).

Even though Officer Osborne did not find appellant to be in violation of any law, the officer persisted in asking appellant if he had a legal amount of fish at his house. The officer implied that a search of appellant's house was necessary to make sure appellant was not violating the law. When Officer Osborne asked if he could go to the house to "count the fish" or "check for" fish, appellant was hesitant. Appellant tried to fend off a potential search of his house by telling the officer "it's a long way." "[E]ffort[s] to fend off a search with equivocal responses" are evidence of a non-consensual encounter. *George*, 557 N.W.2d at 581 (quotation omitted). It was only after further discussion that appellant acquiesced to the officer's request. Although appellant ultimately told the officer it was okay to go to the house, "[c]onsent must be received, not extracted," and appellant's "right to say no" was ultimately compromised by the officer's "show of official authority." *See Dezso*, 512 N.W.2d at 880. Thus, the nature of the encounter was such that it was coercive from the beginning, and continued to be coercive at the house.

Under the totality-of-the-circumstances analysis we also consider "the kind of person the defendant is, and what was said [before and during the search] and how it was said." *Brooks*, 838 N.W.2d at 569 (quotation omitted). Here, appellant was a 69-year-old man, with minimal law enforcement contact. When he was approached at the lake, he was not engaged in any illegal behavior. The entire encounter at the house was reminiscent of an interrogation. Two on duty officers were present throughout the search of the house.

6

*See George*, 557 N.W.2d at 581 (finding that consent was not voluntary when defendant was confronted by "not one, but two law enforcement officers"). The officers persistently questioned appellant about where the fish were located. *See Diede*, 795 N.W.2d at 848 ("We have found consent to be involuntary when given in response to persistent questioning."). Officer Osborne accused appellant of being deceptive, made comments such as "the more you work with us, the more we'll work with you," and told appellant "you know, we're going to look through all this stuff." These remarks took away any meaningful opportunity appellant had to decline the search, because they implied the house would be searched regardless of appellant giving consent, and that it was in appellant's best interest to consent to the warrantless search.

In its order, the district court emphasized that appellant did not "object" to the search and "did not tell the officers to stop the search." However, appellant's "[f]ailure to object is not the same as consent." *See Dezso*, 512 N.W.2d at 880 ("[T]he trial court's conclusion that the defendant 'voluntarily surrendered' the wallet is not sustainable simply because there was an 'absence of any protest.'"). Appellant was never expressly asked for his consent to search the house, nor did the officer explain appellant could decline to consent. *See id.* at 881 (finding that consent was not voluntary when there was "no indication that defendant was aware that he could refuse" the search). Although we note it is not necessary that the consenting person be informed of the right to refuse for consent to be effective, it is helpful in determining the consent was voluntary. *Brooks*, 838 N.W.2d at 572. It was apparent that appellant was not "aware that he could refuse" the search when, at one point in the search, he felt compelled to ask permission to use the bathroom in his own home.

7

Considering the nature of the encounter, the kind of person appellant is, what was said, and how it was said to him, we are not convinced that the state proved by a preponderance of the evidence that his consent was voluntary. After "careful appellate review" of the record, *George*, 557 N.W.2d at 580, we hold that the district court's finding that appellant voluntarily consented to the search was clearly erroneous. *Diede*, 795 N.W.2d at 846.

## II.

The state filed a motion to strike appellant's pro se brief. "We will not consider pro se claims on appeal that are unsupported by either arguments or citations to legal authority." *State v. Bartylla*, 755 N.W.2d 8, 22 (Minn. 2008). Appellant's pro se brief contains no citations to the record, attempts to introduce evidence outside of the record, and has no legal argument; for these reasons, the state's motion is granted. *See State v. DeWalt*, 757 N.W.2d 282, 290 (Minn. App. 2008) (declining to address pro se arguments that are either fully addressed in the public defender's appellate brief, are dependent on facts not in evidence, or have no apparent importance, and are not supported by any legal argument or citation to authority).

**Reversed; motion granted.**

12/15/15

8